THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
VERNON SCHMITT *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 85—0697, 85—0751 cons.

Opinion filed July 8, 1988.

68

Thomas J. Royce and Kent R. Carlson, both of Chicago, for appellant Vernon Schmitt.

James J. McGraw, Joel Gould, and Vincent Davino, all of Chicago, for appellant Frank Nielson.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, and Michael D. Krejci, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:
Following a bench trial the defendants, Vernon Schmitt and

Frank Nielsen, were found guilty of unlawfully delivering a controlled substance, cocaine, to Glenn Schneider on January 5, 1983. (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a).) Schmitt was sentenced to seven years' imprisonment and Nielsen was sentenced to nine years' imprisonment. The issue relied on by Schmitt, on his appeal, is that the trial court erred in denying his motion to dismiss the indictment against him because the State violated its agreement to release and not prosecute him in return for his self-incrimination and successful assistance to the agents in identifying, obtaining evidence against and arresting his drug source, the codefendant Nielsen. Nielsen argues for reversal of his conviction that the trial court erred when it did not grant his motion for a severance from the trial of his codefendant Schmitt.

Prior to trial, defendant Schmitt filed a motion to dismiss the indictment as to him on the ground that the Illinois Department of Law Enforcement agents promised him that for his cooperation and actual assistance in obtaining evidence against his drug supplier, codefendant Nielsen, the State would release and not prosecute him for his unlawful drug delivery to Schneider. Defendant Nielsen filed a pretrial motion for a severance from the trial of defendant Schmitt on the grounds that Schmitt made numerous post-arrest statements which implicated Nielsen in the commission of the alleged drug offense and which were inadmissible against Nielsen but on which the State would improperly rely as evidence against Nielsen. Schmitt's dismissal motion was denied; the trial court did not grant Nielsen's motion for a severance and both defendants were tried jointly.

The trial evidence established that on January 5, 1983, Agent Schneider, of the Illinois Department of Law Enforcement, Division of Criminal Investigation, while at Schmitt's home purchased 2½ ounces of cocaine from Schmitt for $5,500. Schmitt was promptly arrested by Agent Schneider and other agents. After being admonished of his *Miranda* rights by the arresting agents, Schmitt was asked by them to assist them in obtaining evidence against and apprehending his drug source, for which, according to the agents, they would bring Schmitt's assistance to the attention of the State's Attorney. Conversely, according to Schmitt, for his assistance in apprehending his drug source, Nielsen, the agents promised him that they would release and not prosecute him for his drug delivery to Agent Schneider.

In reliance on the agents' promise, the terms of which were controverted, Schmitt told the agents that he received the cocaine from defendant Nielsen, who had brought the cocaine to Schmitt's home earlier that day, that Schmitt had not paid Nielsen for the drugs and

that Nielsen was to return to Schmitt's home later for the purchase money. Schmitt called Nielsen on the telephone monitored by the agents and had Nielsen come to his house. With Schmitt's permission, the agents hid in various parts of the house. Upon Nielsen's arrival, Schmitt engaged Nielsen in incriminating conversations which were overheard by the agents and Schmitt gave Nielsen the money for the drugs which Nielsen had previously delivered to Schmitt and which drugs Schmitt had sold to Agent Schneider. Nielsen was promptly arrested by the agents. Schmitt's handwritten signed confession, which related Schmitt's activities, as above stated, was admitted into evidence.

Schmitt testified in his own behalf on his defense. Schmitt admitted that he sold the drugs to Agent Schneider, that upon his arrest he told Agent Schneider and the other arresting agents that he had obtained the drugs which he sold Agent Schneider from the codefendant Nielsen, who had brought the drugs to Schmitt's home earlier that day, that he had not paid Nielsen for the drugs and that Schmitt expected Nielsen to later return to his home for the money for the drugs. Schmitt stated that in reliance on the agents' promise that he would be released and not be prosecuted for his unlawful drug delivery to Agent Schneider, he cooperated with the agents, called Nielsen on the phone and had Nielsen return to his house for the drug purchase money, that he engaged Nielsen in self-incriminating conversations of their drug transaction and gave Nielsen money for the drugs within the presence and hearing of the secreted agents, who thereupon promptly arrested Nielsen, and that he wrote and signed a written confession of his involvement.

On this appeal, defendant Nielsen contends that the trial court erred in denying his severance motion. The State exclusively argued in the trial court that the trial court conducted two separate trials. The trial court agreed and so ruled in denying Nielsen's post-trial motion. The State's sole argument in it's brief before this court is that "the trial court properly granted a severance to defendant Nielsen and *** a trial court is presumed to consider only competent evidence during a joint trial," and that "the trial court did in fact recognize the severance for evidentiary purposes." The record clearly establishes the contrary. There were not two separate trials. No severance really occurred. The record affirmatively reflects that there was but a single joint trial. A review of the trial sequence and chronology permits no other valid conclusion.

When the cause came on for trial on November 26, 1984, both defendants were simultaneously called and they together appeared

before the bar. The trial judge jointly advised them of their right to be tried by a jury and they responded, thusly:

"THE COURT: Mr. Nielsen and Mr. Schmitt, you both understand that you have a right to a trial by jury. That means 12 people would be selected; they would listen to the evidence; and they would determine your guilt or innocence. You can waive your right to a trial by jury and be tried by myself, and I would be the one to listen to the evidence and determine your guilt or innocence. I gather by signing this jury waiver, you wish for me to decide the case, is that correct?

DEFENDANT NIELSEN: Yes.

DEFENDANT SCHMITT: Yes.

THE COURT: All right. You may be seated."

Thereupon, the prosecutor made a motion to sequester the witnesses during the trial and the motion was granted. The prosecutor then waived opening statement. The attorney for the defendant Schmitt made his opening statement, after which the attorney for the defendant Nielsen waived opening statement.

Agent Glenn Schneider was called as the State's first witness. Agent Schneider related on direct-examination his purchase of cocaine from Schmitt at Schmitt's home, Schmitt's arrest and cooperation with the agents in luring his drug supplier, the codefendant Nielsen, to Schmitt's home, Schmitt's self-incriminating inducement of Nielsen into making admissions of his illegal drug involvement with Schmitt which were overheard by the agents, and Nielsen's arrest by the agents.

Schmitt's attorney cross-examined Agent Schneider, not to discredit or disprove Agent Schneider's direct testimony of Schmitt's drug sale to Agent Schneider, but rather to further substantiate Agent Schneider's direct testimony of the sale and to establish the agents' promise to Schmitt to release and not prosecute him, and Schmitt's resultant cooperation with the agents in inculpating Nielsen in Schmitt's drug sale and Nielsen's arrest by the agents.

Nielsen's attorney did not cross-examine Agent Schneider, but there was further redirect examination of Schneider by the prosecutor and further re-cross-examination of him by Schmitt's attorney.

Agent Osborne Curtis was called as the State's next witness. Agent Curtis testified on direct-examination that he surveilled the defendant Schmitt on January 5, 1983, at Schmitt's home, that Schmitt attempted to flee out a window and was arrested and that he recovered the money given Schmitt by Schneider for the narcotics purchase from the yard next door to Schmitt's residence where

Schmitt had surreptitiously discarded it. Only Schmitt's attorney cross-examined Agent Curtis.

Agent David C. Hamm was the next witness called by the State. He related that he supervised the Schmitt-Schneider narcotics purchase-sale investigation, that he observed Agent Curtis enter Schmitt's residence, that when he heard the prearranged radio arrest signal from Agent Schneider, he entered Schmitt's residence and observed through an open window other agents on the ground level. Agent Hamm went to the side of the house, where he observed Schmitt in the custody of other agents. Agent Hamm further related that Schmitt was given his *Miranda* admonitions and that Schmitt told the agents that he wished to cooperate. Schmitt told them that he had received the cocaine he had sold Agent Schneider from Frank Nielsen, who brought it to Schmitt's home earlier that day and for which Schmitt had not paid Nielsen; that Schmitt was expected to call Nielsen, who would come over and get his money for the purchase price of the drugs. Agent Hamm stated that Schmitt told them that he was willing to make the telephone call to Nielsen with the agents present in his home. Hamm and Schmitt agreed that Schmitt would call Nielsen and that the agents would be present to overhear the conversation between Schmitt and Nielsen when Nielsen arrived. As the plan was being formulated, Agent Curtis recovered from the adjacent yard the $5,500 Agent Schneider had given Schmitt for the purchase of the drugs which had been thrown there by Schmitt through a window in his house.

Schmitt made the telephone call and Agent Hamm overheard Schmitt say, "It is me, Vern. It's okay, you can come on over. I've got your money; he's gone. When will you be here? Okay." Schmitt hung up and told Hamm, "He will be here in about ten minutes."

Agent Hamm put the $5,500 on the kitchen counter and he and the other agents hid in various parts of Schmitt's house. Hamm stated that while they were secreted Nielsen and a young lady entered the house. After about 20 minutes of conversation which Hamm was unable to distinguish because of the furnace noise, Nielsen came near where Hamm was secreted and told Schmitt to make sure he knew who he was dealing with. At that moment the agents came out of hiding and arrested Nielsen and the lady, Belinda Colon. The agents recovered $3,200 from Nielsen's pants pocket, $2,400 of which was from the $5,500 that Agent Hamm had left on the kitchen counter. Hamm further related that later at their Des Plaines office he witnessed Schmitt handwrite and sign his confession.

Nielsen's attorney cross-examined Agent Hamm on Schmitt's sale

of the drugs to Agent Schneider, Schmitt's attempt to flee out the window, Schmitt's arrest in his yard by the agents, and the agents' recovery of the drug purchase money in the yard. Agent Hamm was further cross-examined:

"Q. He [Schmitt] asked you what he could do to help himself?

A. That is correct.

\* \* \*

Q. And did you then sit down with Vernon Schmitt and engage him in a conversation about how he could help himself?

A. In essence, I did.

\* \* \*

Q. What help did you ultimately say, 'Vernon, you can help yourself and this is what I'm going to give you,' what did you say?

A. After a short discussion between myself, Agent Williams, and Mr. Schmitt, we arrived at an agreement that after he had told us that the contraband had been delivered earlier that day from Mr. Nielsen and his friend Belinda, that he was expected to make a telephone call, that he had not paid for the contraband, suspected cocaine, that he was expected to call Mr. Nielsen back and tell him to come to his house and pick up his money, and he agreed that he would do that."

Hamm additionally related that Schmitt called Nielsen, the agents secreted themselves in Schmitt's house, that he told Schmitt just to have a normal conversation, to let the conversation flow as it would normally flow and that Nielsen arrived at Schmitt's residence shortly thereafter.

Nielsen's attorney cross-examined Agent Hamm:

"Q. Now, you had a conversation with Mr. Schmitt prior to the arrival of Mr. Nielsen to the apartment, did you not?

A. That is correct.

Q. And you and other agents in your conversation with Mr. Schmitt generally advised Mr. Schmitt as to what you were looking for, isn't that correct?

A. The substance of this conversation with Mr. Schmitt was about an anticipated conversation.

Q. Right.

A. That he would have with Frank Nielsen and Belinda Colon.

Q. Right.

A. As they arrived at the home.

Q. Correct.

* * *

Q. *** [Y]ou had generally advised [Schmitt] as to the, what it is, what kind of conversation you wanted them to have?

A. Schmitt had told us that when he arrived there, there would be a conversation about the cocaine that was the subject of the meeting and I told him, well, let the conversation flow without any specific direction as to what words to use or anything like that.

Q. And further, sir, in refreshing your recollection by looking at your written report, did you also see that you had indicated that defendant Schmitt stated that he wanted to cooperate and assist the agents by calling Mr. Nielsen and by having Mr. Nielsen return to his home in order to pick up his share of the money?

A. That is correct.

* * *

Q. Now, further, Agent Hamm, did you see that in the written report that you submitted with regard to the January 5th occurrence, you had indicated in writing that Schmitt had advised the agents that Mr. Nielsen was in fact his source for all of the sales to Agent Schneider, those sales taking place on January, excuse me, on the 29th, the 30th, and for the current day, January 5th?

A. Yes, ***.

Q. And you indicated as well that Mr. Schmitt had told you that Nielsen came with his girlfriend, Belinda, shortly before Agent Schneider appeared on the scene on January 5th, he delivered the controlled substance to Mr. Schmitt and then he left, is that correct?

A. That is correct.

Q. And your indication here is that Schmitt further acknowledged that he did not prepay any monies to Nielsen for this controlled substance rather that Mr. Nielsen was expecting a telephone call in order to return and get his portion of the payment.

A. That is correct."

Daniel Callahan was next called, as the fourth witness, by the State. Agent Callahan testified that he was assigned to assist in the surveillance and arrest in a narcotic investigation on January 5, 1983, at 2415 East Church Street, Des Plaines; that he received an

electronic arrest signal which prompted him and three or four other agents to enter the house; when Agent Schneider opened the door they pursued the defendant, Vernon Schmitt, through the house and discovered that he had jumped out the window and had been apprehended outside by other surveilling agents. Agent Callahan further related that Schmitt was brought back into the house, where the agents advised him of his *Miranda* rights, at which time Schmitt told the agents that he had thrown away the purchase money for the drugs; that Agents Hamm and Williams reached an agreement with Schmitt, who wanted to cooperate. Callahan stated that Schmitt told him in which closet to hide and he entered that closet as other agents hid in other places in the house.

Callahan testified that while he was hiding in the closet the codefendant, Frank Nielsen, and Belinda Colon came into the house and entered the kitchen, where Callahan could see them from his vantage point, approximately six feet away through the cracked closet door. Callahan heard Schmitt state to Nielsen that his customer, referring to Agent Schneider, was satisfied with the drugs and Nielsen responded that "he should have been satisfied because it was good rock from Bolivia."

Callahan's direct testimony continued, as follows:

"[Assistant State's Attorney]: *** [D]id you continue to maintain your position in the closet?

A. Yes, I did.

* * *

Q. And at what point did you come out from the closet?

A. After I had heard Nielsen counting money, at which point there was some discussion Nielsen had asked if all the money was his, and Schmitt stated no, some of it was his, and Nielsen exclaimed that he was surprised, he thought all of it was his, and then it was indicated that Nielsen was leaving and I heard the voices leaving the kitchen area.

Q. When you heard the voices leaving the kitchen area from your vantage point, what happened or what did you do next, Agent Callahan?

A. I exited the closet, entered into the family room where they were walking toward the front door, announced my office, at which time the other agents came out of various hiding places.

Q. And when the other agents came out from their positions and you walked into the family room, what occurred next?

A. Nielsen and Colon were placed under arrest."

Agent Callahan was cross-examined by Schmitt's attorney on Schmitt's agreement with Agents Williams and Hamm to cooperate in obtaining evidence against and apprehending his drug supplier, the codefendant, Frank Nielsen. Agent Callahan stated that the agents only told Schmitt that his cooperation would be brought to the attention of the State's Attorney's office. Schmitt's attorney noted that, "not one of the witnesses that testified in this case has made a single note in about 80 pages of police reports about this agreement, and I find that somewhat incredible."

Codefendant Nielsen's attorney at this time cross-examined Agent Callahan, who then testified that while he was secreted in the closet, he could distinguish Schmitt's voice from Nielsen's voice, and that when he came out of the closet he arrested Nielsen, from whom $2,400 was recovered.

After Agent Callahan testified, the fifth and final witness called by the State was Agent David Williams, who testified that on January 5, 1983, he and Agent Dave Hamm were engaged in the surveillance of the house at 2415 West Church Street in Des Plaines, Illinois. He observed a person he later learned was the defendant Frank Nielsen driving an automobile with a female passenger down Church Street. Agent Williams further related that he saw Agent Schneider enter the house at 2415 West Church Street, after which a signal was given and he and Agent Hamm went into the house to find Vernon Schmitt. Schmitt was not in the house. He had exited the house through a bedroom window. Agent Williams went outside, brought Schmitt back into the house and advised him of his constitutional rights, per *Miranda*. Agent Williams stated that he asked Schmitt if he wished to cooperate and Schmitt told him that he was eager to do so. Agent Williams testified further:

"Q. Did you have further discussion regarding cooperation?

A. *** I indicated to him we were interested in who his cocaine connection was, who he was getting it from, and who hand delivered it to him earlier that day and who he was supposed to pay for that and if he would be willing to go through with the transaction, meaning do whatever he would normally do, and he indicated he would do that and that we could listen to him make the phone call and remain in his house for Mr. Nielsen to return and pick up his end of the money.

* * *

Q. What specifically did he do or say at that point?

A. Subsequent to agreeing to cooperate, he made, he indi-

cated that we could remain in his house in a secreted position for Mr. Nielsen, when Mr. Nielsen returned. He then went to the telephone *** and made a phone call to Mr. Nielsen."

Agent Williams stated that the only promise made to Schmitt was that they would advise the State's Attorney's office of his cooperation.

After Schmitt made the phone call to Nielsen, Agent Williams and the other agents secreted themselves in various parts of Schmitt's house to await Nielsen's arrival. Agent Williams heard persons enter the house and engage Schmitt in conversation, and upon hearing the prearranged signal, he exited his hiding position and arrested Frank Nielsen and Belinda Colon. At the agents' headquarters, Schmitt handwrote and signed a confession of his involvement with Frank Nielsen in narcotics dealings, which confession Agent Williams identified as People's exhibit No. 4 and which was also signed as witnesses by Agents Hamm and Williams.[1]

Schmitt's attorney cross-examined Agent Williams, who then testified that he specifically asked Schmitt if he wanted to give a written statement and Schmitt answered that he did. Williams related also that Schmitt requested to call his attorney and that he did so.

---

[1]Vernon Schmitt's three-page, handwritten and signed confession, People's exhibit No. 4, which was admitted into evidence, stated: "I Vernon L. Schmitt, have known Frank Nielsen for approximately four years. We have done construction work together over the last few years and I know he has a girl friend named Belinda who I believe lives with him. A few months ago he was telling me how he made easy money selling some cocaine. That I should try and sell some because he knew I needed money. Frank said he could always buy cocaine anytime. So a few weeks ago I met a man called Ed in a bar. He told me if I knew anyone with any equipment for sale. I said sometimes I know of some and maybe I could get him a bobcat, sometimes when I drink a lot I stretch the truth a bit. He also said he knew somebody who could use some coke. I then thought of what Frank said to me. I then said I think I can get some. Ed said he would call me. I called Frank and said I could sell some. He said he would sell me an eighth for three hundred, so I bought it and called Ed and told him I had an eighth for three hundred and fifty dollars. Ed came to my house and I gave it to him. Then Ed called and wanted a half, so I called Frank again and told him I needed a half. Frank came to my house with an [sic] half. I bought it for $800 and gave it to Ed for $1,200. Then Ed called and said could I get two ozs. I again called Frank and he brought 2½ ozs. for $2,300. So he came to my house with 1½ ozs. I told him I could pay after Ed would come by. He said O.K. Then I called Ed and said I could have it today 12-5-83. Ed said he would come over at 4:30 p.m. Frank bought [illegible] get the money so he could [illegible] Ed came to my house. I gave him the coke and he paid me $5,300.00. Frank returned later with Belinda to collect his money which I gave him. He then talked about his coke dealings and how he could get all he wants and how much he has seen and made money from."

Williams further stated on cross-examination by Schmitt's attorney that Schmitt expressed a desire to cooperate and the agents promised Schmitt that they would inform the State's Attorney's office of his cooperation in identifying, in obtaining evidence against, and in aiding in the arrest of his drug supplier, the codefendant Nielsen. Agent Williams related that he told Schmitt that he wanted him to write out a statement of his narcotics dealings with Nielsen and that Schmitt did so.

The attorney for the defendant Frank Nielsen did not cross-examine Agent Williams.

The parties stipulated that the chemist who examined the substance purchased by Agent Schneider from Schmitt would testify that the substance was cocaine. People's exhibit No. 4, Schmitt's handwritten signed confession, was admitted into evidence. The State rested. Frank Nielsen's attorney then moved and argued for a finding of not guilty at the close of the State's case. The assistant State's Attorney argued in opposition to Nielsen's motion for a finding of not guilty, to which Nielsen's attorney argued in response and the trial court denied the motion. The defendant Frank Nielsen rested, at which time the trial court stated:

"THE COURT: We will take the evidence on Schmitt, and then do a closing on both of them ***."

At this time, Schmitt's attorney made a motion for a finding of not guilty at the close of the State's case and waived argument. The assistant State's Attorney simply responded by asking that Schmitt's motion be denied and the trial court thereupon denied the motion.

The assistant State's Attorney then waived closing argument as to the defendant Nielsen. Nielsen's attorney made a closing argument, contending therein that the evidence failed to establish beyond a reasonable doubt that the defendant Frank Nielsen delivered a controlled substance, cocaine, to Glenn Schneider on January 5, 1983, as charged in the indictment. The assistant State's Attorney's closing argument, in opposition to Nielsen's attorney's closing argument, urged, *inter alia*,

"[T]his is a classic case *** where the defendant, Vernon Schmidtt [*sic*], was what we might call the middle man in this transaction, or sale, of Cocaine, and that Mr. Nielsen was the supplier.

* * *

In particular, I would direct the Court's attention to the testimony of Agent David Hamm, who also was in a position in the house where he could not be seen, but from where he

could hear what was going on, *once Mr. Nielsen walked into Schmidtt's [sic] house, as prearranged by Schmidtt [sic] and the agent, after the delivery of the Cocaine and the arrest of Mr. Schmidtt [sic].*

\* \* \*

[Mr.] Nielsen, who entered the house, *after the phone call was placed to him.*

\*\*\* *[H]e was able to hear Mr. Nielsen, as he was leaving— or, attempting to leave the Schmidtt [sic] house, say, just know who you are dealing with,* \*\*\*.

\* \* \*

Prior to Mr. Nielsen arriving at the house, your Honor must take into account the testimony of the agent; that Mr. Schmidtt [sic] had agreed to cooperate with him, and place a phone call to his source.

That, although the agents could only hear one side of that conversation; that being what Mr. Schmidtt [sic] said on the phone, that he placed a call to an individual who he referred to as 'Frank.'

That he arranged for him to come to the house, indicating that his customer was gone and that, some time thereafter, co-incidentally enough, the defendant in this courtroom, Frank Nielsen, arrived at that house.

\* \* \*

Mr. Schmidtt [sic] then tells Nielsen his customer was satisfied with the quality of the Cocaine. A reference to what had preceded Mr. Nielsen's arrival; that being the delivery of the Cocaine to Agent Schneider.

The Court, I believe, can infer from the evidence that there had been preceding conversations of some nature between Mr. Schmidtt [sic] and Mr. Nielsen, from the beginning of their conversation with Mr. Schmidtt [sic], advising Mr. Nielsen that his customer was satisfied with the quality of the Cocaine.

\* \* \*

\*\*\* [T]here had been prior conversations between the two individuals about, indeed, this Cocaine, and the delivery of it to somebody, who, in this case was Agent Schneider.

\* \* \*

\*\*\* [I]t was Mr. Nielsen who brought that Cocaine, originally, for the sale, and that he returned upon the call of Mr. Schmidtt [sic] to pick up his share of the proceeds of the sale of that Cocaine."

At the conclusion of the prosecutor's final closing argument against the defendant Frank Nielsen, the trial court stated that it did not wish to render a finding as to Nielsen until after it had heard the remainder of Schmitt's case and deferred it's decision on Nielsen's innocence or guilt.

Thereupon, the trial judge administered the oath to the defendant Vernon Schmitt, who testified in his own behalf, Schmitt testified that he met Agent Schneider on December 16, 1982, in a lounge called "J.J. Jiggs"; that they met occasionally thereafter and discussed heavy duty machinery; that Schneider called him several times on the telephone and finally requested him to obtain cocaine for him. Schmitt told Schneider that his brother used it but that he, Schmitt, "was not into that." Schneider thereafter repeatedly asked him to obtain cocaine for him and Schmitt finally agreed to do so and on December 28, 1982, he obtained three grams of cocaine from Nielsen for $300 and gave it to Schneider. A few days later Schneider asked Schmitt to obtain more cocaine and Schmitt called Nielsen, from whom he again acquired cocaine and gave it to Schneider for $1,200, out of which Schmitt related he profited $100.

Schmitt further related that on January 4, 1983, Schneider told him that he wanted three ounces of cocaine, that he called Frank Nielsen, who stated to Schmitt that he had to call him back. On the following day, Schneider came to Schmitt's house and Schmitt had the cocaine on the counter. Schneider weighed it, went outside to his car to get the money, returned and gave Schmitt the money for the cocaine. The doorbell rang, Schmitt looked out the door, saw agents on his front lawn, became frightened and jumped out the bedroom window. When he landed on the ground, the money scattered out of his hand and he was arrested. The agents took Schmitt back into his house and advised him of his *Miranda* rights.

Schmitt stated that pursuant to Agent Hamm's request he agreed to cooperate, that Agent Hamm told him that they wanted his drug source and when Schmitt asked what was in it for him, Agent Hamm told him that he would "get a pass," which Schmitt understood to mean that he would not be in trouble—that he would be released and would not be prosecuted for his drug delivery to Agent Schneider. Schmitt testified further:

"Q. After he told you that, did you call somebody?

A. Well, he asked me when I was going to hear from the guy. I said I would call him and he said, 'Well, if you would call him, and get him back here to the house, part of your co-operation.' And I said, 'All right.' So, I went to the rec room,

made my phone call; told him to come here, and then hung up. He said that he would go hide in the closet; then, when Frank would, I was to take him into the kitchen. Then he told me what I should ask him."

Schmitt stated that soon thereafter Nielsen arrived at his home, at which time the agents were hiding throughout the house. Frank came in and walked into the kitchen, Schmitt had the money on the counter and said to Frank, "Here's your bread; count out the bread. How was that coke?" Frank said, "Well, it was good. The guy wanted a lot of rocks, because it was good cola. It is the best. I use it for myself, from Bolivia." As Frank was about to leave, the agents came out of hiding and arrested Frank.

Schmitt stated that at the agents' headquarters, he handwrote and signed a three-page confession, People's exhibit No. 4, and that he did so and cooperated with the agents in revealing and apprehending his source of the drugs, Frank Nielsen, because the agents promised him that he would be released and would not be prosecuted, that he fulfilled his end of the bargain with the agents but they did not fulfill their end of the bargain with him.

On cross-examination, Schmitt testified that the first three grams of cocaine he delivered to Agent Schneider was obtained by him from Frank Nielsen for $300. He also obtained the second amount of cocaine from Frank Nielsen that he delivered to Schneider, for which he profited $100. Schneider then wanted two ounces of cocaine and told Schmitt that he could make a $1,000. Schmitt called Nielsen, who told him that he did not have that much but to call him back. On January 5, Schmitt called Nielsen, who told him he had the two ounces and would bring it to Schmitt's house and Nielsen did so. Schneider came, weighed the cocaine and told Schmitt the money was in the car. Schneider left, returned and gave Schmitt $5,500 for the cocaine. The doorbell rang and he saw all the agents outside. Schmitt related further on cross-examination:

"Q. And did you have to contact anyone else, in order to find cocaine for Schneider, on the first initial deal?

A. I tried two or three people, like I said.

Q. Okay, and then, ultimately, you tried Mr. Nielsen, correct?

A. Yes, man.

Q. And, after you were able to procure the first cocaine, for the first, December 29th delivery, you made all the appropriate phone calls in order to make the connections with Nielsen, correct?

A. Yes ***.

\* \* \*

Q. Okay, and you had sort of, like settled on Nielsen, if I am correct, that he was the one, of all the people that you had tried to contact, and Nielsen seemed to be the one who was able to have a ready supply?

A. Well, it's considered to be a rich man's habit.

Q. And Nielsen is a rich man?

A. To my knowledge, yeah.

Q. Well, in any event, you did contact him, ask him if he had available the three grams?

A. Said—asked him, you know, he had—he had to tell me, so I told Schneider that, too.

Q. Okay, so then, you did call Nielsen back, to make sure that he was able to supply?

A. Yes, man.

Q. And so, once you were able to get the rich man's drug from Mr. Nielsen, you decided to stay with him?

A. It just was convenient, at the time, you know ***."

There was no redirect examination of Schmitt and Schmitt rested. The State presented no rebuttal evidence. The State waived opening argument. Schmitt's attorney argued in closing that the evidence established that Schmitt was entrapped into delivering the drugs to Agent Schneider, and he additionally argued:

"[W]hen Schmitt is arrested in the apartment *** this whole transaction as one fraught with police encouragement or, in Vernon Schmitt's case, producing and becoming a witness against the man he is sitting next to [Frank Nielsen]. I suggest, your Honor, but for Vernon Schmitt, Mr. Nielsen ain't here in that class X delivery *** there isn't one piece of evidence, absent Vernon Schmitt's conduct, that brings Mr. Nielsen to this court. What was the source? *** They wanted a source. That is what they wanted, Judge. We know, on the 5th, that is all they wanted, was a source."

Schmitt's attorney additionally argued that based on the agents' promise to him that he would be released and not prosecuted if he revealed his drug source and cooperate in obtaining evidence against him and in apprehending him, that Schmitt did so, called his source Frank Nielsen on the telephone, had him to come to his home in which the agents hid, listened and observed, that he gave Nielsen money for the drugs and engaged Nielsen in incriminatory conversations, that Schmitt should therefore be found not guilty.

In closing argument against Schmitt, the assistant State's Attorney urged that the evidence established that Schmitt was not entrapped into delivering the drugs to Agent Schneider. It is noteworthy that not once during the assistant State's Attorney's closing argument did he discuss Schmitt's evidence or attempt to respond to his attorney's argument that based on the agents' promise that he would be released and would not be prosecuted if he cooperated, Schmitt revealed his drug source and assisted in obtaining evidence against him and that Schmitt should be found not guilty because of the agents' failure to keep their promise.

At the end of the assistant State's Attorney's closing argument against Schmitt, the trial court concluded:

"We have had two separate trials. I have reviewed all the evidence in each, and made the appropriate separation, and seen to it that no evidence with respect to the defendant could be used as to the other defendant.

After considering all of the testimony, with respect to Mr. Schmidtt [*sic*], I find the defendant guilty. With respect to Mr. Nielsen, I find the defendant guilty."

With due deference to the trial court, for it to have fantasied from the foregoing trial proceedings and evidence that two separate trials were held ignored reality and required a total disregard of actuality.

The State's brief in this court urges the ambivalent positions that, "the assistant State's Attorney agreed to the trial being severed and that since it was a bench trial, the court was presumed to only consider competent evidence against each defendant," and that, "the record reflects that the trial court did in fact recognize the severance for evidentiary purposes and that defendant fails to show any prejudice as a result." Either there was a severance or there was not a severance. Either there were "two separate trials" or there were not "two separate trials." The foregoing trial proceedings and trial evidence clearly establish that there was no severance, that there were not two separate trials and that there was but a single trial.

■ The case at bar is indeed unique in several particulars. The single count indictment jointly charged the defendant, Vernon Schmitt, and the codefendant, Frank Nielsen, with the unlawful delivery of drugs to Glenn Schneider. The State's evidence presented during their joint trial established that Schmitt delivered the drugs to Agent Schneider and was immediately arrested. Schmitt promptly told the agents that he had obtained the drugs from Nielsen. Schmitt

agreed to cooperate and in fact cooperated with the agents to obtain evidence against Nielsen and to apprehend him. The State's evidence further established that Schmitt called Nielsen on the telephone, monitored by the agents, and lured Nielsen to return to Schmitt's house to receive the purchase money for the drugs. When Nielsen entered Schmitt's house, with Schmitt's approval the agents were secreted throughout the house and observed and overheard Schmitt's induced incriminating drug offense conversations with Nielsen. Schmitt gave Nielsen the money for the drugs which was witnessed by one of the secreted agents. The agents hastily arrested Nielsen, who had the drug purchase money in his possession. Schmitt authored and signed his own confession of the foregoing events, which was admitted into evidence at their joint trial. During the trial, Schmitt did not challenge the veracity of the State's evidence, but rather, he frankly admitted its truthfulness. His defense was entrapment and that his post-arrest conduct with Nielsen was induced by the agents' promise to release and not prosecute him, whereas, in contrast, Nielsen's defense was that the evidence failed to establish his guilt beyond a reasonable doubt of a drug delivery to Schneider. Although perhaps possible, yet it is difficult to conceive of a greater antagonism between two defendants' defenses.

At the close of the State's case, Nielsen argued for a finding of not guilty on reasonable doubt grounds. The prosecutor argued in opposition. The trial court denied the motion. Nielsen rested without presenting any evidence in his defense. The prosecutor waived opening argument. Nielsen's attorney made a further reasonable doubt closing argument, to which the prosecutor made responding closing argument. The trial court made no finding as to Nielsen and stated that it would reserve ruling on Nielsen's innocence or guilt until after it had heard Schmitt's defense.

Schmitt then testified in his own behalf, during which he extensively related, and for the first time to the trial court, his acquisition of drugs from Nielsen on three other occasions for Schneider, for which they were not charged or on trial. Schmitt further related his acquisition of the drugs from Nielsen, which drugs were involved in his January 5 drug delivery to Agent Schneider. Schmitt further related his aforementioned cooperation with the agents in incriminating and apprehending Nielsen. As his defense, it is glaringly apparent that Schmitt presented voluminous evidence of Nielsen's guilt. Schmitt admitted authoring and signing his confession, which inculpated Nielsen and which his lawyer presented to the trial court to read. Schmitt's attorney argued entrapment, Schmitt's cooperation

and the agents' reneging on their promise to release and not prosecute Schmitt as grounds for finding Schmitt not guilty.

The instant case is indeed unparalleled. Our research fails to reveal another case, such as this, in which a drug seller is jointly tried with his drug source, contrary to the source's demand for a severance, during which trial there is presented extensive evidence and a confession of the seller's cooperation with the agents in obtaining inculpating evidence against and in apprehending the drug source and in which the drug seller relies on entrapment and the agents' unkept promise to release and not prosecute him as his defense, and the drug source contradictorily relies on reasonable doubt as his defense. For the trial court to have completely separated and dissected the total foregoing trial evidence in the case at bar and exclusively applied it to that defendant to which it was solely applicable, totally uninfluenced by all the other incriminating evidence which was inapplicable to such defendant, required Herculean intellectual gymnastics which exceed human capabilities. Thus, the State's argument in the case at bar that the trial judge sitting as the fact finder in the defendants' joint trial is presumed to consider only competent evidence against the respective defendants is utterly specious.

■■ In *People v. Nuccio* (1969), 43 Ill. 2d 375, during the defendant's bench trial for murder, the prosecutor in cross-examining the defense witnesses repeatedly insinuated that the defendant police officer and other police officers had previously threatened the deceased and other State witnesses. The prosecutor failed to call any witnesses on the State's case in rebuttal to prove up or substantiate these insinuations. On appeal, the defendant relies for reversal on the failure of the prosecutor to present evidence to support the insinuations of threats against the deceased and the other State's witnesses by the defendant. The State urged in *Nuccio*, as the State similarly urges in the case at bar, that it will be presumed that a judge considers only competent and proper evidence in reaching his decision and that the trial judge in a nonjury trial must be presumed to have disregarded incompetent evidence. In rejecting application of this presumption, and in reversing the conviction and remanding for a new trial in *Nuccio*, the supreme court persuasively stated:

> "The rule [that a trial judge is presumed to have considered only competent evidence] as generally applied is a sound one. *But there are, it seems to us, limits to the immunity to improper and prejudicial insinuations which judges are presumed to possess.* \*\*\*. Where, as here, the guilt of the accused \*\*\* is dependent upon the degree of credibility accorded by

the trier of fact *** and there appear in the record substantial numbers of unsupported insinuations which, if considered, could have seriously impeached the credibility of the defendant and his witnesses, and there is no indication of the court's awareness of this impropriety even though it is brought to his attention, it is our opinion that justice and fundamental fairness demand that the defendant be afforded a new trial free from such prejudicial misconduct." (Emphasis added.) 43 Ill. 2d at 396.

In *People v. Pettis* (1982), 104 Ill. App. 3d 275, 432 N.E.2d 935, the trial court simultaneously held a bench trial for the defendant, Eric Pettis, and a preliminary hearing for the codefendant, Eric Smith, on a charge of criminal trespass to a vehicle. Pettis appealed his judgment of conviction contending for reversal that the trial court erred when it allowed the arresting officer to testify to the codefendant Smith's statement that the defendant Pettis knew that the car, driven by codefendant Smith and in which defendant Pettis was a passenger when they were arrested, was stolen. In reversing Pettis' conviction, this court appropriately stated:

"In *Bruton v. United States* (1968), 391 U.S. 123, 135-37, 20 L. Ed. 2d 476, 484-86, 88 S. Ct. 1620, 1627-28, the Supreme Court held that, in a joint trial, the introduction of a codefendant's out-of-court confession, which implicates the defendant, violates the latter's right to confrontation, where the co-defendant making the statement cannot be subjected to cross-examination at trial. Defendant contends that the introduction of Eric Smith's statement violated his sixth amendment right to confrontation, as outlined in *Bruton*, since Smith failed to testify at defendant's trial. The State, citing *People v. McNeal* (1977), 56 Ill. App. 3d 132, 136-37, 371 N.E.2d 926, argues that a violation of rights under the *Bruton* rule was not designed for and has not ever been applied to a bench trial as was the proceeding in the present matter.

*The decision in Bruton concerned a defendant's right to confront the witnesses against him and to subject those witnesses to cross-examination to test the veracity of their statements. In determining whether there has been a violation of that right, it would appear to be irrelevant that the trial is one before a jury or before a judge.* A close reading of *People v. McNeal* (1977), 56 Ill. App. 3d 132, 371 N.E.2d 926, indicates it stands for the proposition that in a bench trial it can usually be presumed that no prejudice has occurred to a

defendant who has been implicated by a co-defendant's confession because, unlike a jury, a judge, being trained in the law, will refuse to consider the statement made by the co-defendant in determining the defendant's guilt. *Thus, McNeal does not stand for the proposition that no violation of defendant's right to confrontation can occur in a bench trial,* but only stands for the proposition that defendant's inability to cross-examine the co-defendant, concerning the co-defendant's confession implicating the defendant, is not usually prejudicial because it will be presumed the judge, as trier of fact, has refused to consider the damaging confession in determining defendant's guilt.

In the present case, the presumption of no prejudice to defendant by the admission of the co-defendant's statement has been rebutted." (Emphasis added.) 104 Ill. App. 3d at 277-78.

■ Those indicted jointly for the commission of a crime ordinarily should be tried together, and ordinarily the matter of granting a separate trial is within the sound discretion of the trial court. (*People v. Murphy* (1981), 93 Ill. App. 3d 606, 609, 417 N.E.2d 759; *People v. McVay* (1981), 98 Ill. App. 3d 708, 424 N.E.2d 922; *People v. Miller* (1968), 40 Ill. 2d 154; *People v. Clark* (1959), 17 Ill. 2d 486.) But this is a judicial and not an arbitrary discretion (*People v. Murphy* (1981), 93 Ill. App. 3d 606; *People v. Miller* (1968), 40 Ill. 2d 486; *People v. McVay* (1981), 98 Ill. App. 3d 708; *People v. Clark* (1959), 17 Ill. 2d 486), and where the circumstances are such that a defendant will be deprived of a fair trial if jointly tried with a codefendant, a severance must be granted (*People v. Murphy* (1981), 93 Ill..App. 3d 606).

■ Confessions and admissions made by an accomplice which inculpate a defendant and to which the defendant does not assent are never admissible against the defendant, whether or not the accomplice and defendant are jointly or separately tried. We have repeatedly held that when a motion for a separate trial is predicated on the premise that a codefendant's confession or admission implicates the moving defendant, a severance should be granted unless the prosecution declares that the admission or confession will not be offered in evidence at the time of trial, or if offered, that there will be eliminated therefrom any and all reference to the party applying for the severance. (*People v. McVay* (1981), 98 Ill. App. 3d 708, 715; *People v. Miller* (1968), 40 Ill. 2d 154, 158-59; *People v. Clark* (1959), 17 Ill. 2d 486, 489-90.) The basis for this long-standing rule requiring severance in such situations is the constitutional guarantee of a fair and

impartial trial and the conclusion, founded on the plainest principles of justice, that admission of a codefendant's statement which implicates a defendant imposes a substantial and unfair prejudice on that defendant. *People v. McVay* (1981), 98 Ill. App. 3d 708, 716.

▪ In the case at bar, the trial court should have granted Nielsen's request for a severance prior to trial based upon the State's intended use of Schmitt's written and oral confessions and admissions which implicated Nielsen in the crime. At Schmitt and Nielsen's joint trial, the prosecution did not refrain from using Schmitt's written and oral confessions and admissions and did not delete therefrom references therein to Nielsen's involvement in Schmitt's narcotic sale to Agent Schneider. Instead, the prosecution presented the numerous agents' testimony that Schmitt told the agents that he received the cocaine from Nielsen, that Nielsen had brought the cocaine to Schmitt's home earlier that day, that Schmitt had not prepaid Nielsen for the drugs and that Schmitt expected Nielsen to return to his house for the money. Pursuant to the agreement between the agents and Schmitt, Schmitt then called Nielsen to his home. All this evidence of Schmitt's conversations and admissions inculpating Nielsen but inadmissible as to him was submitted to the trial court during the defendants' joint trial.

The prosecution also presented Schmitt's hand-authored confession in which he detailed Nielsen's involvement in Schmitt's drug sales to Schneider. Additionally, after the State had rested it's case in chief, after Nielsen had likewise rested, after the trial court had heard the attorneys' closing arguments as to Nielsen, and after the trial court deferred making a finding as to Nielsen, the trial court then heard Schmitt's voluminous testimony, presented in Schmitt's defense but clearly inadmissible as to Nielsen, which meticulously set forth Nielsen's participation in Schmitt's three other drug delivery offenses to Schneider, for which the defendants were not charged or on trial, as well as Nielsen's involvement in Schmitt's January 5, 1983, drug delivery to Schneider, for which the defendants were charged and on trial, but on which the State had rested its case as to Nielsen. The trial court belatedly found Nielsen guilty, but only after hearing Schmitt's particularized, inadmissible prejudicial testimony of Nielsen's guilt.

▪ Nielsen's attorney raised the trial court's belated guilty finding of Nielsen during his argument of Nielsen's motion for a new trial. The trial court fallaciously responded:

"THE COURT: *** [Y]ou raised the fact that the Court [did] not decide the Nielsen case after it was argued, and instead

waited until having concluded the Schmitt case. I note from the charge, as you all are aware, that the charge against Mr. Nielsen was an accountability charge in that he was accountable for the delivery of the substance to Mr. Schneider by Mr. Schmitt.

So, accordingly logic caused me to believe that I should first reach a verdict on Schmitt in order to be certain that I was correct in reaching a verdict on Nielsen."

This response by the trial court was flawed, first, because the charge against Nielsen was not an accountability charge. The one-count indictment alleged that on January 5, 1983, in Cook County, Illinois, Vernon Lee Schmitt and Frank Nielsen "committed the offense of delivery of controlled substance in that they unlawfully and knowingly delivered to Glenn Schneider otherwise than as authorized in the Illinois Controlled Substance Act of said State of Illinois then in force and effect, more than thirty grams of a substance containing a certain controlled substance, to wit: cocaine in violation of Chapter 56½, Section 1401(a) Illinois Revised Statutes."

The trial court's aforestated response was flawed, second, because even on an accountability theory or charge, the law does not require that the principal be found guilty as a prerequisite to a finding of guilty of the accountable accessory. (Ill. Rev. Stat. 1983, ch. 38, par. 5—3; *People v. Pettit* (1983), 114 Ill. App. 3d 876, 449 N.E.2d 1044.) The trial court recognized this legal principle. Nielsen's attorney stated, "Judge, I don't think the law requires that even on the accountability theory that the principal be found guilty. The principal doesn't have to be found guilty on the theory of accountability." The trial court agreeing stated, "That is true."

The trial court's response that *"logic caused me to believe that I should first reach a verdict on Schmitt in order to be certain that I was correct in reaching a verdict on Nielsen"* (emphasis added) is flawed, third, because the trial court's verdict on Schmitt would not make certain the correctness of the trial court's verdict on Nielsen. Moreover, according to the trial court, there had been two separate trials, and thus, according to the trial court, the evidence should have been separately applicable to each defendant, and the verdicts therefore as to each defendant should likewise have been unrelated to and independent of the other.

Further responding to Nielsen's attorney's argument regarding the trial court's postponed guilty finding of Nielsen, after Schmitt's testimony of Nielsen's numerous illegal drug deliveries in support of Schmitt's entrapment defense, the trial court additionally stated:

"And my belief was that it was necessary for the Court to be certain as to the separation of the cases, and that's why I wanted to see to it that I had all the evidence in on the Schmitt case to make sure that the reasons for my ruling were in fact separate, and I would say this, too, on the finding of guilty with respect to Nielsen: I substantially rely on the conversation in the kitchen and the statement that Mr. Nielsen made during that conversation in the kitchen that the agent overheard, and then the other physical evidence that was introduced with respect to Mr. Nielsen's case. So I was satisfied in that regard that the basis for the decision was settled."

The trial court's post-verdict self-admonishments were nothing but a collocation of words futilely designed to validate the trial court's erroneous failure to have granted Nielsen a separate trial. They fail in their purpose and they likewise failed to afford Nielsen the legal protection to which he was entitled from the prejudice of his codefendant's inadmissible inculpating hearsay admissions and confessions and other improper incriminating evidence occasioned by and permitted at their joint trial.

A similar severance issue was recently resolved by the supreme court in *People v. Hernandez* (1988), 121 Ill. 2d 293, where the defendant contended that statements made by his codefendant Cruz were improperly admitted at their joint trial with insufficient redaction to protect the defendant's right to confront and cross-examine witnesses against him, a right guaranteed by both the State and Federal Constitutions. Three prosecution witnesses testified at trial to the incriminating statements made by Cruz. (In the case at bar five witnesses similarly testified to the statements of Schmitt, which incriminated Nielsen.) The names of the defendant and Buckley, who was also a codefendant at the joint trial, were eliminated from Cruz' statements, but their names were replaced with code, the words "friends," "named individuals" and "friends from Aurora." In the case at bar, however, the agents' testimony of the codefendant Schmitt's post-arrest self-incriminating statements which implicated the defendant Nielsen were not redacted. Indeed, the defendant Nielsen was expressly and repeatedly implicated. In reversing the defendant's conviction for murder and the other related offenses, the supreme court in *Hernandez* held:

*"The State argues that even if there was a potential for unfair prejudice by the admission of Cruz' statements, the trial court guaranteed a fair trial by giving limiting instructions advising the jury that statements by Cruz and Hernandez*

*could be considered only against their authors.* That is precisely the argument rejected by this court in *Buckminster* and by the Supreme Court half a century later in *Bruton*. [Citation.] *According to Buckminster, '[i]t would be difficult to imagine any evidence that would be more prejudicial' than inculpation of the defendant by a nontestifying codefendant. (People v. Buckminster* (1916), 274 Ill. 435, 448.) *To suggest that the jury disregard such explosive evidence is, in the words of Judge Learned Hand, a 'recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else.'* [Citations] *('we cannot accept limiting instructions as an adequate substitute for [the] constitutional right of cross-examination'); [citation] ('The naive assumption that prejudicial effects can be overcome by instructions to the jury \*\*\* all practicing lawyers know to be unmitigated fiction').) Likewise, the trial court's ruling to strike Mares' reference to a 'friend' could not undo the damage already done; as this court has previously warned, 'it is practically impossible for the average juror to divest his mind of such testimony.' [Citation.]*

*We hold, therefore, that under these circumstances the defendant was deprived of his constitutional right to confront a prosecution witness and, consequently, of a fair trial."* (Emphasis added.) 121 Ill. 2d at 317-18.

█ In the case at bar, the defendant Nielsen was likewise deprived of his constitutional right to confront a prosecution witness and, consequently, of a fair trial. In reversing Cruz' murder conviction in the companion case to *Hernandez, People v. Cruz* (1988), 121 Ill. 2d 321, the supreme court held:

"In *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the Supreme Court ruled that the admission in a joint trial of a statement by a nontestifying codefendant violated the defendant's constitutional right to confront witnesses against him, where that statement expressly named the defendant as an accomplice in the crime charged. The *Bruton* Court reasoned that 'there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored' [citation] and that the admission of a statement 'expressly implicating' the defendant constituted such a context. \*\*\*

* * *

In this case we are not dealing with a carefully redacted written confession, we are dealing with out-of-court admissions made by defendants to third parties which inculpated other defendants. To date then, the Supreme Court has examined admission of a codefendant's confession which *explicitly* names the defendant [citation] * * *. * * *

The *Bruton* decision, as well as decisions of this court, recognizes that there are circumstances under which the presumption that a jury can and will follow a trial court's instruction to disregard an incriminating inference generated by a confession or admission introduced against a codefendant must fall. [Citation.] In *Bruton*, as we have noted, this meant the presentation to the jury of a statement by a codefendant directly naming the defendant as an accomplice." (Emphasis in original.) 121 Ill. 2d at 329-31.

In the instant case, Nielsen was likewise implicated by the codefendant Schmitt's statements, in which Nielsen was repeatedly named as Schmitt's accomplice. Admission of Schmitt's statements requires reversal of Nielsen's conviction. In *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, a postal inspector testified that the codefendant orally confessed to him that he and Bruton committed an armed robbery. The trial court instructed the jury that although the codefendant's confession was competent evidence against him, it was inadmissible hearsay against Bruton and therefore had to be disregarded in determining Bruton's guilt or innocence. On appeal, the Court of Appeals affirmed Bruton's conviction based on the trial court's instructions to the jury. However, the United States Supreme Court held that because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining Bruton's guilt, admissions of the codefendant's confession in the joint trial violated Bruton's right of cross-examination secured by the confrontation clause of the sixth amendment. In the case at bar, (as in *Bruton*), Schmitt did not take the stand during Nielsen's trial. The agents testified that Schmitt confessed to the drug offenses and that Nielsen was his drug source. We conclude that the admission of Schmitt's confessions in the joint trial violated Nielsen's right of cross-examination secured by the confrontation clause of the sixth amendment to the United States Constitution and article I, section 8, of the Illinois Constitution, and that Nielsen was entitled to a severance thereunder, as well as under section 114—8 of the Code of Criminal Proce-

dure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 114—8), which provides:

"If it appears that a defendant *** is prejudiced by a joinder of *** defendants for trial the court may *** grant a severance of defendants ***."

The State and Federal constitutional rights of confrontation and cross-examination are not merely asthenic or cosmetic rights, but rather, they are substantive rights. The dissent's suggestion that the principles enunciated by the Supreme Court in *Bruton* are inapplicable in a nonjury trial directly conflicts with the contrary holding of the Supreme Court in *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056, a joint nonjury trial in which the Supreme Court held that *Bruton* principles were applicable. Moreover, *Bruton* involved only an inadmissible codefendant's confession, whereas the instant case involves appreciably more inadmissible incriminating evidence against Nielsen. In fact, most of the State's evidence against Nielsen involved the post-arrest inadmissible statements and the activities of Schmitt and the agents in "setting up" Nielsen, which, again contrary to the dissent, was directly related to Schmitt's inadmissible confessions and which evidence is not ignored but instead is completely set forth herein. In addition, Schmitt's post-arrest inadmissible statements and activities were clearly antagonistic to Nielsen's defense.

This court recently reversed the defendant's murder conviction and sentence in *People v. Dixon* (1988), 169 Ill. App. 3d 959, because the trial court denied Dixon's severance motion, which asserted that his and the codefendant Moore's defenses were antagonistic and that the admission of Moore's statement at trial would violate Dixon's sixth amendment right of confrontation, stating, "[W]e find that the State has failed to overcome the weighty presumption that Moore's statement expressly inculpating defendant in the shooting was inherently unreliable and, therefore, constitutionally inadmissible as un-cross-examined evidence against him." 169 Ill. App. 3d at 976.

The State's reliance on *People v. McNeal* (1977), 56 Ill. App. 3d 132, 371 N.E.2d 926, *People v. Monroe* (1984), 125 Ill. App. 3d 592, 466 N.E.2d 393, *People v. Gholston* (1984), 124 Ill. App. 3d 873, 464 N.E.2d 1179, and *People v. Moore* (1984), 128 Ill. App. 3d 505, 470 N.E.2d 1284, is misplaced. In none of these cases was there evidence of a defendant's post-arrest agreement, admissions and cooperative acts in obtaining incriminating prearrest evidence against the codefendant. In none of these cases did a testifying defendant rely on entrapment, or testify to evidence which incriminated the codefendant,

as the testifying defendant's defense.

In *McNeal*, police officers apprehended Smith and McNeal as they fled the murder shooting scene, at which time McNeal had in his possession a weapon which could have been the murder weapon. The codefendant Smith made a post-arrest statement which inculpated defendant McNeal. The State excised all reference to the defendant McNeal in his codefendant Smith's statement on their joint trial for murder and attempted murder, after denying McNeal's severance motion. The appellate court further pointed out in *McNeal* that "the record clearly indicates that the trial court stated that the admissibility of the statement was limited to Smith. It was the trial judge who demanded that McNeal's name be stricken from the document. Furthermore, the judge continually sustained defense counsel's objections to the admission of the statement insofar as it applied to McNeal and specifically instructed himself to disregard any application of the statement as to McNeal." (*McNeal*, 56 Ill. App. 3d at 139.) *McNeal* certainly is inapplicable to the case at bar.

In *Monroe*, each of the four defendants gave to the police separate exculpatory statements in which they each asserted that the alleged victim's acts of sexual intercourse were voluntary. In affirming their rape convictions arising out of their joint trial, the court rejected the defendants' contention that the trial court erred in refusing to excise reference to the codefendants in each defendant's statement and by reading each defendants' unexcised statement, pointing out that, "When defendants raised this issue at trial, the court specifically stated that it 'would not consider what one says against the other in this situation.' " (*Monroe*, 125 Ill. App. 3d at 595.) *Monroe* is not remotely analogous to the case at bar.

In *Gholston*, the defendants made post-arrest confessions of their participation in the rape, robbery and beating of the victim. The trial court in a single proceeding simultaneously conducted two jury trials and four bench trials of the multiple defendants. The assistant State's Attorney read the contents of each defendant's statement during the course of the bench trials, which, in affirming their convictions, this court rejected as reversible error, stating, "The trial court properly considered the in-court identifications of the defendants which were made by the victim in corroboration of her previous, positive lineup identifications. The court properly admitted into evidence the incriminatory statements, the voluntariness of only one which has been contested on this appeal. Further, there is absolutely no indication that the court, as trier of fact, improperly considered the inculpatory statements of one offender as substantive evidence

against any of the other offenders." (*Gholston*, 124 Ill. App. 3d at 887.) *Gholston* is not controlling here.

In *Moore*, both defendants, Moore and Wooten, confessed. The beaten deceased victim was placed in a plastic container by the defendants and witnesses observed them unsuccessfully attempting to drive the body from the murder area down an alley on the trunk of a car. The body fell off the car into the alley where the defendants were observed by the witnesses to leave it. On the defendants' joint bench trial, the trial court repeatedly and explicitly informed defendants that any statements made by a defendant would be considered only against the declarant, and in affirming the defendants' manslaughter convictions, this court pointed out that the trial court's admonitions were supported by the record and prevented a conclusion that the trial court abused its discretion in denying a severance. *Moore* is completely dissimilar to the instant case.

■ In the instant case justice required that the trial of Schmitt and Nielsen be severed. The evidence of Schmitt's post-arrest conversations with and admissions to the agents were clearly inadmissible against Nielsen. Moreover, the agents' voluminous inadmissible testimony of their conversations with Schmitt and the agents' testimony of their activities with Schmitt in "setting up" and apprehending Nielsen, the aforestated chronological posture in which the evidence was presented and in which the trial was conducted, counsel's statements and arguments and the sequences in which they too were presented, the trial court's belated rulings and delayed guilty finding, and the trial court's stated flawed basis on which it predicated the delayed guilty finding demand the conclusion that Schmitt and Nielsen's joint trial was unfair and inappropriate. The trial court did not specify or designate the particular evidence on which it predicated its separate guilty findings, but rather, the trial court generalized that it had "reviewed all the evidence in each, and made the appropriate separation and seen to it that no evidence with respect to the defendant could be used as to the other defendant." It appears therefrom that the trial court was simply concerned with verbally justifying and rhetorically defending its erroneous refusal to grant Nielsen's severance request. Additionally, Schmitt's testimony in his defense was extremely antagonistic to Nielsen's defense and, more importantly, it was invincibly incriminating evidence of Nielsen's guilt. Refusal to grant Nielsen a severance constituted reversible error. Therefore, Nielsen's judgment of conviction is reversed and his cause is remanded for a new trial.

Defendant Schmitt contends the trial court erred in denying his

motion to dismiss the indictment because the agents reneged on their promise to release and not prosecute him for his drug sale to Agent Schneider if he cooperated, revealed and "set up" his drug source.[2] Schmitt cooperated, revealed and produced his drug source, the code-fendant Frank Nielsen, who was arrested and prosecuted.

In *United States v. Pascal* (N.D. Ill. 1979), 496 F. Supp. 313, the indictment charged the defendant with various narcotic violations after the Drug Enforcement Administration (DEA) had promised the defendant that his cooperation in apprehending his drug source would be made known to the United States Attorney's office and the DEA would recommend that no indictment be returned against the defendant for his narcotics violations. The DEA failed to keep the promise. The government characterized the defendant's cooperation as not significant or productive in *Pascal.* The evidence established that the defendant was unable to fully perform under the agreement because of matters over which the defendant had no control. The government conceded that defendant was entitled to the benefit of his bargain but argued that his cooperation was minimal and did not warrant an absolute guarantee from prosecution and that the appropriate remedy was dismissal of the indictment "without prejudice," which would allow a possible subsequent prosecution of the defendant. Contrarily, the defendant argued that the agreement between

---

[2]Schmitt's dismissal motion alleged as follows:

"Now comes defendant VERNON SCHMITT, by and through his attorney, THOMAS J. ROYCE, and moves this court to enter an order dismissing this indictment, in support hereof the following is stated:

(1) That on or about January 5, 1983, the defendant was arrested in his residence in Des Plaines, Illinois.

(2) That said arrest was effected by members of the Illinois Department of Law Enforcement.

(3) That upon his arrest he was taken into custody by said agents.

(4) That at the time of his arrest and thereafter, conversations occurred wherein the defendant promised that if he cooperated in the production of his 'suppliers' he would not be prosecuted for his conduct.

(5) That pursuant to those promises defendant in fact 'cooperated which enabled the said agents to arrest and develop information causing the prosecution of co-defendant herein.'

(6) That notwithstanding said 'cooperation', the defendant is being prosecuted in violation of his Illinois and United States Constitutional Right to due process.

Wherefore, defendant Vernon Schmitt prays that these indictments be dismissed."

A memorandum of authorities was also submitted by Schmitt's attorney in support of Schmitt's dismissal motion.

him and the DEA was two pronged. First, defendant agreed to cooperate and that his cooperation would be made known to the United States Attorney's office. Second, the DEA agreed to recommend to the United States Attorney's office that defendant not be prosecuted for his drug offenses. There was evidence of substantial cooperation by the defendant with DEA. But the DEA did not recommend to the United States Attorney that defendant not be prosecuted.

Unlike in *Pascal* where the agent merely promised that he would recommend that defendant not be indicted, according to Schmitt the agents in the case at bar promised Schmitt that he would be released and would not be prosecuted. He agreed to cooperate and he did cooperate, which effectuated the acquisition of the evidence against and the arrest of his drug source, Nielsen. Schmitt then additionally authored a handwritten confession of his and Nielsen's involvement in drug trafficking. Schmitt contends, as did the defendant in *Pascal*, that the agreement between him and the agents was two pronged: first, Schmitt was made an offer which he accepted and, second, that Schmitt complied with the offer, waived his constitutional right to remain silent, confessed and revealed Nielsen as his drug source. He described his drug transaction with Nielsen and he arranged to complete the transaction with Nielsen in his home in a manner that would enable the agents to observe it, overhear their conversations and apprehend Nielsen.

The State argued to the trial court that it had no authority to dismiss the charges against Schmitt because section 114—1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1987, ch. 38, par. 114—1) did not authorize dismissal of a charge based on a violation of due process, the grounds urged by Schmitt. Schmitt's attorney argued to the trial court that a due process violation was a ground for dismissal of a charge even though such ground may not be set forth in section 114—1 (Ill. Rev. Stat. 1987, ch. 38, par. 114—1).

■ The term due process is a concept which does not readily lend itself to a precise definition. Basically, it is the protection of the individual from arbitrary and capricious detrimental government action. (*Ohio Bell Telephone Co. v. Public Utilities Comm'n* (1937), 301 U.S. 292, 302, 81 L. Ed. 1093, 1100, 57 S. Ct. 724, 729.) The fifth amendment to the United States Constitution provides that "[n]o person shall be *** deprived of life, liberty, or property without due process of law." (U.S. Const., amend. V.) Article I, section 2 of the Illinois Constitution also provides that "[n]o person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws." Ill. Const. 1970, art. I, §2.

■■■ In *People v. Lawson* (1977), 67 Ill. 2d 449, 454, "The State's Attorney objected to the trial court's dismissals [of the indictments], contending that the court could only do so on one of the grounds listed in section 114—1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1973, ch. 38, par. 114—1) and not on the basis of a denial of due process." At the defendants' urging, the trial court in *Lawson* dismissed the indictments, which alleged unlawful deliveries and possession of drugs, on the grounds that the delay between the alleged dates of the offenses and the return of the indictments prejudiced the defendants in their defenses and denied them due process. The supreme court stated that an issue on appeal was "whether the trial court has authority to dismiss an indictment, information or complaint on the basis of denial of due process even though that it is one of the grounds listed in section 114—1 of the Code of Criminal Procedure of 1963 ***." (67 Ill. 2d at 455.) Answering the question in the affirmative, the supreme court stated:

"[W]e believe that on the basis of the reasoning of our past decisions *** we must conclude that a trial court does have an inherent authority to dismiss an indictment in a criminal case where there has been a clear denial of due process even though that is not a stated ground in section 114—1.

*** In other words, the grounds for dismissing an indictment under section 114—1 are *not* exclusive. *** Moreover, the trial court has 'inherent authority to insure the defendants a fair trial' and may impose sanctions to do so. [Citation.] Because the trial court has the obligation to insure a fair trial, it would seem only reasonable that, where there has been an unequivocally clear denial of due process such as actual and substantial prejudicial delay before an indictment or arrest, the trial court has the inherent authority to dismiss. Due process is a fundamental premise of our system of justice and is constitutionally guaranteed by the fourteenth amendment. It does not need enabling legislation. ***

There is another point to consider: the efficient and effective administration of justice. *** [W]here a denial of due process *** occurs before trial and has not been corrected, then the courts 'are not required to engage in futile or useless action and proceed to trial' [citation]; they may dismiss." (Emphasis in original.) (67 Ill. 2d at 455-56.)

It is clear from *Lawson* that the trial court in the case at bar had authority to dismiss the indictment on due process grounds. The trial court, however, did not rely or rule on Schmitt's alleged due process

violation in overruling his dismissal motion.

In the instant case, the uncontroverted evidence established that the agents asked Schmitt to cooperate in identifying, obtaining evidence against and in apprehending his drug source. The evidence likewise established, also without contradiction, that Schmitt agreed to and did cooperate with the agents as previously set forth. The dispute in the trial evidence is over what the agents promised. They testified at trial that for Schmitt's cooperation they merely promised Schmitt that they would notify the State's Attorney's office of his cooperation. Contrarily, Schmitt testified that the agents promised him that for his cooperation he would be released and would not be prosecuted for his drug delivery to Agent Schneider. Schmitt's attorney repeatedly pointed out throughout the trial that, oddly, the agents' reports did not state what promise or the terms of the promise the agents made to Schmitt. If, uniquely, the agents only promised Schmitt that they would bring his cooperation to the attention of the State's Attorney's office, as the agents testified, and if they did so, Schmitt nevertheless was prosecuted, convicted and sentenced to seven years' imprisonment. Nielsen, Schmitt's drug source, was sentenced to only nine years' imprisonment. On the state of the record before us, it appears that for his cooperation Schmitt's reward was a trip to and seven years' imprisonment in the penitentiary, possibly with his drug supplier against whom he informed, while dangerously labeled as an informer, a snitcher, or stool pigeon. This result, it would seem, overtaxes common decency and fairness.

There was a similar acrimonious conflict between the defendants' and the agents' testimonial versions of the terms of their cooperation agreement in *United States v. Carrillo* (9th Cir. 1983), 709 F.2d 35. The agents contended that the defendant agreed to testify in court against the drug offenders who were arrested and charged arising out of the defendant's cooperation and assistance. The defendant denied that he agreed to so testify, because he feared for the safety of his family and himself. It was established that pursuant to their cooperation agreement the defendant made numerous contacts with and arranged to purchase narcotics from several suspects who were arrested therefore and charged therewith. The defendant refused to testify at their trials, which resulted in the government being forced to dismiss all charges as to two of the drug offenders and four counts as to the third. Notwithstanding its promise not to prosecute the defendant for his narcotics violations, the government indicted him on the ground that he had breached the cooperation agreement by refusing to testify against the offenders against whom he had

made cases. The defendant, contending that he never promised to testify at their trials, moved to dismiss the indictment against him based on the government's promise not to prosecute him. The trial court rejected the agents' testimony, accepted the defendant's contention that he had not agreed to testify as the logical version of the agreement and dismissed the indictment. In affirming the dismissal order as "effectively enforc[ing] the [cooperation] agreement," the court of appeals pointed out:

"The district court was called upon to make a factual determination as to the nature and scope of an agreement between the government and [defendant] Carrillo. Contradictory evidence was introduced at the hearing. Implicit in the district court's ruling is the finding that the government agreed to refrain from prosecuting Carrillo in exchange for his cooperation and assistance in the subsequent investigation. Because Carrillo steadfastly maintained his unwillingness to testify, there was no mutual assent as to that point and it did not become a part of the agreement ***. The court therefore concluded that because there was no meeting of the minds with respect to the written terms, the agreement to testify was not part of the bargain between the parties. We cannot say, in light of the conflicting evidence on this issue, that this finding is clearly erroneous." 709 F.2d at 37.

The trial court in the case at bar did not conduct an evidentiary hearing on Schmitt's dismissal motion (and did not resolve the conflict between Schmitt's and the agents' trial testimony as to the terms of the agreement). In denying Schmitt's dismissal motion prior to trial, the trial court stated:

"Motion to dismiss is denied. I want the record to be quite clear if I should find that the police have lied or intimidated or cajoled the defendant into doing illegal conduct I will provide whatever remedy appropriate for that which is tied to this conduct.

There is no admission here the prosecutor was involved in the police officer's conduct and when you raise contract notions there certainly is no admission that the police officers were specifically the prosecutor's agent for making a determination as to whether or not charges would be filed with respect to this case. Accordingly, I do not believe that a motion to dismiss lies and the motion to dismiss is denied."

It is apparent that the trial court did not decide Schmitt's dismissal motion on due process grounds. Rather, the trial judge er-

roneously denied Schmitt's dismissal motion because the prosecutor was not involved in the agents' agreement with Schmitt and because *"there certainly is no admission that the police officers were specifically the prosecutor's agent for making a determination as to whether or not charges would be filed with respect to this case."* (Emphasis added.) Here, no question can be raised that State action was not involved. Here no question can be raised that the agents were not agents of the State of Illinois, *i.e.*, the Illinois Department of Law Enforcement. As stated in *United States v. Pascal*, quoting from the opinion of Justice Brandeis in *Olmstead v. United States* (1928), 277 U.S. 438, 485, 72 L. Ed. 944, 960, 48 S. Ct. 564, 575 (Brandeis, J., dissenting):

"In a government of Laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent, teacher. For good or for ill, it teaches the whole people by its example." *United States v. Pascal*, 496 F. Supp. at 317.

■■ Clearly, the trial court had the inherent authority on due process grounds to dismiss the indictment in the case at bar. (*People v. Lawson* (1977), 67 Ill. 2d 449; *People v. Shields* (1978), 60 Ill. App. 3d 493, 377 N.E.2d 68.) Schmitt confessed his involvement and waived his fifth amendment privilege against self-incrimination and fulfilled his part of the agreement. In so doing he further incriminated himself. He cooperated with the agents in apprehending his drug source, a tactic unequivocally desired by law enforcement and readily accepted by the courts in the never-ending struggle to curb and combat the nefarious enterprise of drug trafficking and usage. The State should be required to fulfill its part of the agreement. A contrary holding would greatly impair if not totally defeat the viable weapon of drug offenders' cooperation with law enforcement in the drug war arsenal. More importantly, a contrary holding would constitute judicial approval of the government violating its agreement, a reprehensible aberration.

Moreover, in the case at bar it was not a question of whether *"the police have lied or intimidated or cajoled the defendant into doing illegal conduct"* (emphasis added), or of the trial court *"provid-[ing] whatever remedy appropriate for that which is tied to this conduct"* (emphasis added), as the trial court erroneously concluded. The questions were whether the agents promised Schmitt that he would be released and not be prosecuted if he cooperated, and if the agents made such a promise, whether the State should be allowed to renege on it after Schmitt had relied and acted thereon to his possible dan-

ger and detriment.

In *People v. Starks* (1985), 106 Ill. 2d 441, the defendant was convicted of an armed robbery of a savings and loan association. His post-verdict newly retained attorney filed a motion for a new trial which alleged that the defendant had submitted himself to a polygraph examination based upon a representation by the State's Attorney's office that the armed robbery charge would be dismissed if the defendant passed the test. The motion further alleged that the defendant passed the test, but that the State's Attorney's office reneged on its part of the agreement. The supreme court pointed out that by submitting himself to the polygraph examination the defendant surrendered his fifth amendment privilege against self-incrimination, as did Schmitt in the case at bar when he cooperated, revealed and "set up" his drug source. The supreme court held in *Starks*:

> "The prosecution must honor the terms of agreements it makes with defendants. To dispute the validity of this precept would surely result in the total nullification of the bargaining system between the prosecution and the defense. Therefore, this court believes that if the prosecution did make an agreement with the defendant, it must abide by its agreement in this case.

> * * *

> *** '[L]aw enforcement processes are committed to civilized courses of action. When mistakes of significant proportion are made, it is better that the consequences be suffered than that civilized standards be sacrificed.' [Citation.]

> * * *

> *** [T]he State has the *right* to 'choose its procedures and weapons of prosecution'; however the State also has the *duty* to abide by an agreement it makes with a defendant. *Butler v. State* (Fla. App. 1969), 228 So. 2d 421, 425.

> We believe that in the case at bar if the State made an agreement with the defendant, it is bound to abide by that agreement.

> Whatever the situation might be in an ideal world, the fact is that agreements between the prosecution and the defense are an important component of this country's criminal justice system. (See *Bordenkircher v. Hayes* (1977), 434 U.S. 357, 54 L. Ed. 2d 604, 98 S. Ct. 663.) If a defendant cannot place his faith in the State's promise, this important component is destroyed.

> In the case at bar, the agreement allegedly rested upon the

State's promise to dismiss the charge against Starks. If there was an agreement as alleged, and if Starks fulfilled his part of it, then the State must fulfill its part." (Emphasis in original.) 106 Ill. 2d at 449-50, 452.

The trial court denied Schmitt's motion to dismiss the indictment. The supreme court's recent decision of March 23, 1988, *People v. Navarroli* (1988), 121 Ill. 2d 516, had not been rendered and the trial court did not then have the benefit of the legal principles articulated therein. In *Navarroli*, the two-court indictment charged the defendant with the felony unlawful possession of cocaine. The defendant and the State's Attorney engaged in plea negotiations and, according to the defendant, pursuant to the terms of their plea agreement, during the following two years the defendant was a police informer in various drug investigations which culminated in the apprehension of drug suppliers, for which the State's Attorney promised to reduce the felony drug charges and to agree that the defendant receive probation on the reduced drug charges. The defendant contended that after his successful performance as an informer the State's Attorney refused to comply with the agreement and reduce the charges. The defendant moved to compel the State's Attorney to comply with the negotiated plea agreement. The State's Attorney denied that there was such an agreement. The trial court conducted an evidentiary hearing and the evidence conflicted on whether there had been such an agreement. The trial court found that the agreement had been made as defendant claimed and ordered the State's Attorney to comply with its terms.

It is noteworthy that in *Navarroli* the agreement was a post-indictment negotiated plea agreement that the State's Attorney would reduce the charges and acquiescence to probation in exchange for the defendant's post-indictment assistance to law enforcement officials in obtaining incriminating evidence of the commission of post-indictment offenses, not against the defendant, but exclusively against others; whereas, in the case at bar the agreement was made after the defendant's arrest and before any charge had been filed against him. According to Schmitt, the agreement was that he would not be charged with the narcotics offense for which he had been arrested in exchange for his post-arrest assistance to law enforcement in obtaining post-arrest incriminating evidence against another as well as himself, for the offense for which he had been arrested. It is additionally noteworthy that, in *Navarroli*, the State's Attorney denied both the existence of the agreement and the terms thereof as claimed by the defendant whereas, in the case at bar, it was only the terms of the

State's promise that were controverted. Moreover, in *Navarroli*, the trial court conducted an evidentiary hearing to determine the existence and terms of the agreement and what relief was warranted, whereas, in the case at bar, the trial court did not conduct an evidentiary hearing and erroneously denied the defendant relief because of the trial court's mistaken legal concept that it lacked authority to dismiss the charges, because the grounds relied on by the defendant were not set forth in the statute which governed the dismissal of charges. Ill. Rev. Stat. 1983, ch. 38, par. 114—1.

The State's Attorney refused to comply with the trial court's order to reduce the felony narcotics possession charges in *Navarroli* and instead appealed. The supreme court *"conclude[d] that the prosecutor's denial of an agreement and refusal to carry out the claimed bargain did not deprive the defendant of due process*, and that therefore, the defendant was not entitled to have the assumed agreement enforced." (Emphasis added.) *Navarroli*, 121 Ill. 2d at 522.

In reaching this conclusion in *Navarroli*, the supreme court relied on *Mabry v. Johnson* (1984), 467 U.S. 504, 81 L. Ed. 2d 437, 104 S. Ct. 2543, and pointed out, (1) that in *Mabry*, "the Court held that the defendant could not challenge his plea under the due process clause because the claimed breach of the plea bargain did not deprive him of his liberty in any fundamentally unfair manner"; (2) that "due process principles govern the enforceability of plea agreements"; (3) that the controlling issue in *Navarroli* was "whether the State's repudiation of the asserted plea agreement constituted a denial of due process," and (4) that *"the State's repudiation of the agreement did not deprive the defendant of liberty or any other constitutionally protected interest."* (Emphasis added.) (*Navarroli*, 121 Ill. 2d at 523, 524.) In arriving at these foregoing conclusions, the following language of the supreme court in *Navarroli* is uniquely applicable to and unequivocally embraces the facts in the case at bar and compels the opposite conclusion to that reached in *Navarroli*:

> "The privilege against self-incrimination protects one from being compelled to disclose facts tending to establish criminal liability. [Citations.] The defendant does not claim that *he engaged in criminal activities in reliance on the proposed bargain*, nor does he state that *the police compelled him to disclose information which might tend to incriminate him.*
>
> *** The defendant did not claim, however, nor does the record suggest, that *agents of the prosecution questioned him about the charges pending against him.* ***
>
> * * *

\*\*\* This court [in *People v. Starks* (1985), 106 Ill. 2d 441,] concluded that enforcement of the promise was necessary because *the defendant surrendered his fifth amendment privilege in exchange for and in reliance on the proposed plea agreement.* [Citation.] Here, in contrast, the defendant did not surrender constitutionally protected interests in reliance on the agreement.

\* \* \*

\*\*\* *[N]one of the statements which the defendant made during the course of his plea negotiations and cooperation, nor any fruits of those statements, were used against him at his subsequent trial* \*\*\*.

\*\*\* [T]he defendant still has the option of pleading not guilty and going to trial. *His right to a fair trial is unimpaired.*" (Emphasis added.) *Navarroli*, 121 Ill. 2d at 525-27, 529.

■■ In the case at bar, in reliance on the agents' promise to the defendant either to inform the State's Attorney of his cooperation, as the agents testified at trial, or to release and not prosecute him for his drug delivery for which the agents had just arrested the defendant, as the defendant testified at trial, it is uncontradicted (1) that the agents questioned the defendant about the offenses for which he had just been arrested; (2) that the agents induced the defendant to disclose information which further established his criminal liability in that offense; (3) that the defendant waived his privilege against self-incrimination by engaging in incriminating admissions to the agents and incriminating conversations with Nielsen in the agents' presence and hearing; (4) that the defendant engaged in further criminal activities with Nielsen when he induced Nielsen to return to Schmitt's home and accept from him the purchase money for the drugs; (5) that the statements uttered by Schmitt during the course of the negotiations and his cooperation, and the fruits of those statements, were used against him at his subsequent trial; (6) that because of his cooperation the defendant did not have a meaningful option of pleading not guilty and going to trial; (7) that the defendant's right to a fair trial was impaired; and (8) that the defendant surrendered constitutionally protected interests. It is clear in the case at bar that the State's refusal to specifically comply with or enforce the agreement deprived the defendant of due process and his liberty in a fundamentally unfair manner.

Unlike in the case at bar, the trial court in *Navarroli* held an evidentiary hearing to determine the existence and/or the terms of the

agreement between the State agents and the defendant. In *Starks*, as in the case at bar, the trial court failed to conduct an evidentiary hearing to determine the terms and conditions of the agreement. The supreme court, however, pointed out in *Starks* that "the State does not deny the existence of the agreement," but that it was "unclear as to the exact terms of the agreement." (*Starks*, 106 Ill. 2d at 447, 451.) The supreme court in *Starks* remanded the cause to the circuit court with directions to conduct an evidentiary hearing to determine if there was an agreement and, if so, to implement it by appropriate order, and if there was no agreement, to reinstate the original judgment and sentence without prejudice to the defendant's rights to appeal.

The disputed terms and conditions of the agreement in the case at bar are questions of fact which the trier of fact should determine after assessing the credibility of witnesses and the weight to be given their testimony, and should be judged under objective standards. The trial court's determination will be sustained on appellate review if it is not contrary to the manifest weight of the evidence. *People v. Navarroli* (1988), 121 Ill. 2d 516, 521-22.

Accordingly, Schmitt's cause is remanded to the circuit court with directions to conduct an evidentiary hearing to determine the terms of the cooperation agreement between Schmitt and the agents and vacate Schmitt's guilty finding, his judgment of conviction and sentence and dismiss the indictment against him if the agents violated the agreement. If Schmitt's guilty finding, judgment and sentence are not vacated and are allowed to stand and the indictment is not dismissed by the trial court, it will be without prejudice to Schmitt's rights to appeal.

Judgment reversed and cause remanded for a new trial as to the defendant Nielsen, cause remanded with direction as to the defendant Schmitt.

Reversed and remanded with directions.

MURRAY, J., concurs.

PRESIDING JUSTICE LORENZ, dissenting in part:
I disagree with the reasons given by the majority to justify reversal of defendant Nielsen's conviction for the failure of the trial court to grant a severance.

The majority concludes the joint trial violated defendant Nielsen's sixth amendment right of confrontation because, although Schmitt's

confession was used as evidence against Schmitt, that evidence implicated Nielsen and Schmitt did not testify against Nielsen. In support, the opinion focuses on authority applying the Supreme Court's ruling in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. In *Bruton*, the Supreme Court held that, in a joint trial, the introduction of a codefendant's out-of-court statement, implicating the defendant, violates that defendant's right to confrontation where the codefendant making the statement is not subjected to cross-examination at trial. That basis for the majority's holding suffers for two reasons.

First, the *Bruton* rule does not necessarily obtain in nonjury trials, such as in the case at bar, because it is presumed that the trial judge relied only on competent and admissible evidence. (*People v. Monroe* (1984), 125 Ill. App. 3d 592, 466 N.E.2d 393; *People v. McNeal* (1977), 56 Ill. App. 3d 132, 371 N.E.2d 926.) While the presumption is rebuttable (see, *e.g., People v. Pettis* (1982), 104 Ill. App. 3d 275, 432 N.E.2d 935), the majority fails to clearly and succinctly explain anywhere in its lengthy opinion how the presumption has been overcome here. The trial judge was at all times aware of the implications presented by admission of the agents' testimony relating to Schmitt's statements in Nielsen's trial. The record is replete with defendant Nielsen's counsel's objections that the trial court should ignore that testimony relating to Schmitt's statements, which implicated Nielsen, for purposes of the case against Nielsen. Those objections were sustained. Schmitt did not testify in the presentation of the case against Nielsen. Further, as the majority notes, the trial judge stated she did not consider evidence used against either defendant as to the other. Nevertheless, the majority dismisses the attaching presumption and concludes that the trial judge could not have properly ignored Schmitt's statements which inculpated Nielsen.

Moreover, it is difficult to envision whatever harmful impact any *Bruton* violation might have had in this case. The majority effectively ignores that other evidence, independent of Schmitt's statements, supports the trial court's verdict as to Nielsen. Agents Hamm, Callahan, and Williams all testified to *firsthand accounts* of the conversation and exchange of money between defendants Nielsen and Schmitt. Nielsen's conviction, therefore, did not rest to any significant degree on any statement of Schmitt.

I respectfully dissent.