**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Edward FIELDS, Defendant-Appellant.**

**No. 84–2552.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 21, 1985.

Decided July 11, 1985.

Joan Bainbridge Safford, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Allan A. Ackerman, Ackerman & Egan, Ltd., Chicago, Ill., for defendant-appellant.

Before WOOD and FLAUM, Circuit Judges, and BROWN, Senior District Judge.*

* The Honorable Wesley E. Brown, Senior District Judge for the District of Kansas, is sitting by designation.

FLAUM, Circuit Judge.

This appeal once again requires us to reconstruct the meaning of an ambiguous provision in a plea agreement. Pursuant to a pre-indictment plea agreement with the government, defendant-appellant Edward Fields pleaded guilty to one count of conspiracy to violate the drug laws in violation of 18 U.S.C. § 371 (1982) and one count of filing a false tax return in violation of 26 U.S.C. § 7206(1) (1982). On appeal, Fields does not question the validity of his guilty pleas, but rather challenges the sentences that he received on the ground that they violate the plea agreement. For the reasons set forth below, we affirm.

## I.

Beginning in 1980, a joint investigation by several federal agencies uncovered evidence of Fields's involvement in a large-scale cocaine-trafficking conspiracy. Based on this evidence, federal agents discussed the possibility of prosecuting Fields for engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848 (1982), an offense that carries penalties of imprisonment for ten years to life, a fine of up to $100,000, and substantial forfeiture of the convicted defendant's assets. In January 1982, a meeting was held between Fields, his counsel Allan Ackerman, and Assistant United States Attorney Jerome Frese, during which Frese expressed his opinion that Fields would be prosecuted under section 848.

Discussions then ensued over a plea agreement that would entail Fields's cooperation with the government in the investigation of others involved in the cocaine-trafficking conspiracy. On January 29, 1982, Fields submitted to the government a written proffer detailing his involvement in the conspiracy, but deleting the names of the other persons involved. Sometime in March of 1982, negotiations concluded and Fields entered into the preindictment plea agreement now at issue. The agreement provided generally that Fields would plead guilty to one count of engaging in a drug conspiracy, carrying a maximum penalty of five years imprisonment and a $10,000 fine, and one count of filing a false tax return, carrying a maximum penalty of three years imprisonment and a $5,000 fine. In return, the government agreed to grant Fields immunity from federal prosecution on any other narcotics, customs, banking, and tax offenses that he had committed up to January 29, 1982.

Because the focus of this appeal is on the meaning of the plea agreement, we review both the agreement itself and the various discussions about it in some detail. The most relevant portion of the agreement for present purposes is paragraph 11, in which Fields agreed that he would "fully cooperate with the government in any investigation in which he is called upon to cooperate which is related to or results from the charges in this case." Several specifically enumerated subparagraphs further describe the cooperation required of Fields, and conclude with the subparagraph that has become the center of the instant dispute:

5. The government anticipates that the period of defendant's cooperation by debriefing and in grand jury testimony may extend to approximately six to nine months. The government and the defendant agree that *the sentencing court might appropriately consider any such period of cooperation to be equivalent to incarceration of the defendant for sentencing purposes* if the sentencing court should determine that the defendant should be incarcerated. (emphasis added)

The agreement also provides in paragraph 17 that "[a]t the time of sentencing, the government shall make known to the sentencing judge the extent of· defendant's cooperation, and except for the provisions in paragraph 11(5) above, the government shall be free to make such recommendations regarding sentence as the government deems to be appropriate." Finally, paragraph 19 of the agreement states: "It is understood by the parties that the sentencing judge is neither a party to nor bound by this agreement and is free to

impose the maximum penalties [on each of the charges].''

Fields was accordingly indicted on the drug conspiracy and false tax return charges on July 27, 1983. Two days later, a conference was convened in Judge Nordberg's chambers for the purpose of both arraigning Fields and accepting his guilty plea on the charges. The attorneys who personally negotiated the plea agreement (Ackerman and Frese) were not present at this conference; instead, Fields was represented by Royal B. Martin, Jr., and the government was represented by Assistant United States Attorney Joan B. Safford. At the beginning of the conference, the parties agreed to postpone Fields's sentencing until after he cooperated with the government by testifying in a case pending before Judge Hart. Judge Nordberg then reviewed the various provisions of the plea agreement and obtained Fields's acknowledgement that he understood and agreed to these provisions.

With respect to the paragraphs of the agreement governing sentencing, the judge initially asked Fields if he understood that under paragraph 19 the sentencing judge would not be bound by the agreement, and Fields affirmed that he did. In the next passage in the record, however, the judge further stated that he had reviewed the indictments against Fields and had discussed the case with Judge Hart, "[s]o, I do feel that I am sufficiently informed that I can indicate at this time that I would consider myself to be bound, to the limited extent that I would be bound, but in any event, that I would accept the plea agreement that has been entered into between the parties...." The judge then asked Fields whether he understood that a maximum penalty of eight years imprisonment and a $15,000 fine "might be imposed upon you by virtue of your plea of guilty to both counts 1 and 2," and Fields answered that he did.

Lastly, the judge reviewed the language of paragraph 11(5) and explained his understanding of how the period of Fields's coop-

eration might be considered as "equivalent to incarceration" for sentencing purposes:

[M]y understanding is that the Court normally doesn't have the power to tell the Parole Board or the Bureau of Prisons ... what time the defendant will be credited with, so, what is really being indicated here is that the Court might articulate that it thought that a sentence of such and such an extended period of time might be appropriate but the Court felt that because of the representations by both counsel for the government and for the defense, the amount of time that the defendant has already spent should be considered as an offset to that, and, therefore, the Court, in effect, would not sentence the defendant for that period of time.

All of the parties, including Fields, agreed to this explanation of the agreement. The judge thereafter accepted Fields's guilty pleas and entered judgments of conviction thereon.

For approximately a year after this conference, Fields continued cooperating with the government. Then, sometime in the summer of 1984, the government filed a presentence submission with the probation officer who was preparing a presentence report on Fields for the court. In this submission, the government first detailed Fields's substantial involvement in a massive cocaine-trafficking conspiracy. By way of contrast, the government then described Fields's "extensive" cooperation in, among other things, helping the government obtain numerous guilty pleas and convictions of others involved in the conspiracy. Based on a balancing of his prior crimes with his subsequent cooperation, the government recommended that the court sentence Fields to the maximum sentence of eight years imprisonment, with the proviso that "the court might appropriately consider the period of his cooperation (2 years 4 months) as time to be subtracted from his period of incarceration and might appropriately sentence him therefore to 5 years 8 months."

On August 20, 1984, Fields filed with the probation officer his response to the government's submission, in which he argued that the government's sentencing recommendation was inconsistent with the plea agreement. First, he stated that his period of cooperation with the government amounted to two years and seven months, rather than the two years and four months that the government had contended. Second, Fields disagreed fundamentally with the government's method of calculating his sentence by merely subtracting his period of cooperation from the maximum sentence of eight years. Fields claimed that in order for the sentencing court to consider this period of cooperation "to be equivalent to incarceration" under paragraph 11(5), the court would have to calculate his sentence in the following manner: (1) the court would initially determine what sentence it would otherwise impose without regard to his cooperation, (2) the court would determine the mandatory release date on this initial sentence, (3) the court would then subtract the period of his cooperation from the mandatory release date on the initial sentence to yield the total time that he should be required to serve in actual incarceration, and finally, (4) the court would impose the sentence that, based on Parole Commission guidelines governing early release, would actually require him to serve the period of incarceration determined in step (3).

This complex formula can be clarified by reference to Fields's calculation of the sentence that he should receive as set forth in his August 20 response. According to Fields, the mandatory release date on an eight-year sentence would be five years and ten months. Subtracting the two years and seven months that he calculated as his period of cooperation from this mandatory release date yields a period of three years and three months that he should actually be required to serve in incarceration. Thus, assuming that before considering his cooperation the court would choose to impose the eight-year sentence that the government recommended, Fields concluded that the court should ultimately sentence him to four years and six months, which, according to Parole Commission guidelines, would actually require him to serve approximately three years and three months incarceration. In sum, based in part on their differing interpretations of the phrase in paragraph 11(5) of the plea agreement stating that Fields's period of cooperation might be considered "equivalent to incarceration," Fields determined that his maximum sentence should be four years and six months, while the government determined that it should be five years and eight months.

The parties' contradictory interpretations of the plea agreement were explored further at Fields's sentencing hearing before Judge Nordberg on September 5, 1984, during which Fields and the government were again represented, respectively, by Royal Martin and Joan Safford. Jerome Frese, who had since become First Assistant United States Attorney for the Northern District of Indiana, testified at length about the prior negotiation and execution of the plea agreement, and about his understanding of the disputed language in paragraph 11(5). As a result of Frese's testimony concerning the calculation of the period of Fields's cooperation, the government agreed to accept Fields's estimate of two years and seven months rather than the government's earlier estimate of two years and four months. Notwithstanding Frese's testimony, however, the parties continued to disagree over how this period of cooperation should be factored into Fields's ultimate sentence.

The government introduced at the hearing several documents that Frese identified as notes and memoranda relating to the negotiation of the plea agreement with Fields and his counsel Allan Ackerman. These documents, in combination with Frese's recollections, revealed that the plea agreement's provision for reducing Fields's sentence based on his cooperation with the government evolved over a period of several weeks of negotiations. In fact, one of the early documents contained a paragraph proposing that the period between the exe-

cution of the agreement and the defendant's sentencing be deemed "actual time served in the custody of the Attorney General and the United States Parole Commission shall take into account in determining the defendant's probable release date, as such time as having been actually served by the defendant." Frese, however, could not identify whether this document was prepared by the government or by Fields's counsel Allan Ackerman, or indicate why similar language was not included in paragraph 11(5) of the plea agreement as ultimately executed.

Frese did testify, however, that at some point during the plea negotiations Fields himself asked about how "good time" would be calculated under the agreement, obviously referring to how his cooperation would be considered for sentencing purposes, and that Frese responded approximately as follows:

> Look, if you cooperate for two years, you can get eight; if the Court considers that appropriate, the Court will give you six. We are free to recommend eight, except that we are bound to tell the Court the period of cooperation might appropriately be considered by the Court as time— as time as if it had been time served already.

Frese repeatedly affirmed that he understood the language of paragraph 11(5) as embodying the kind of agreement that he described to Fields in this passage, and not as requiring the government or the court to factor Parole Commission guidelines or mandatory release dates into the sentencing formula. When questioned by Fields's counsel Royal Martin concerning the use of Parole Commission guidelines in calculating Fields's sentence, Frese stated, "that was never my understanding and I don't see that in the language, Mr. Martin."

Although Fields offered no testimony or other evidence at the sentencing hearing to contradict Frese's testimony, Martin reiterated to the judge that Fields, Ackerman, and he had always understood that Fields's period of cooperation would be deemed "actual incarceration" for sentencing pur-

poses. While this general interpretation of the agreement was consistent with the interpretation adopted in Fields's prior memorandum for the probation officer, Martin's manner of calculating the appropriate sentence pursuant to this interpretation had materially changed. At the sentencing hearing, Martin argued that after deciding what sentence it would initially impose without regard to Fields's cooperation, the court should then review Parole Commission guidelines to determine the *parole date*—rather than the mandatory release date—for that sentence, and should therefore subtract the period of cooperation from this parole date in order to determine the length of time that Fields should be required to serve in incarceration.

This modification in steps (2) and (3) of Fields's prior sentencing formula described above yielded a significantly different sentencing figure because the mandatory release date on an eight-year sentence was five years and ten months (seventy months), while the parole date on the same sentence under Parole Commission guidelines was forty to fifty-two months. Using the forty to fifty-two month figure as a base, and then subtracting Fields's two years and seven months (thirty-one months) of cooperation, Martin argued that the court should impose at the most a sentence that would require Fields to serve either nine or twenty-one months. Hence, applying step (4) of the earlier sentencing formula, Martin concluded that Fields should receive a sentence of either a year and a day or slightly under three years, the sentences that under Parole Commission guidelines would require Fields to serve nine or twenty-one months, respectively. Despite the major difference between this sentencing proposal and Fields's prior proposal of four years and six months, Martin offered no reason for this change.

At the conclusion of the hearing, Judge Nordberg stated initially that "it has been brought out clearly that I am not bound by the plea agreement." Given that he was not bound, the judge explained that "it was not my intent that I would seek to deter-

mine the sentence by taking the range of the Parole Board guidelines and then subtract[ing] the time that the defendant has cooperated with the government...." Although he therefore rejected Martin's sentencing formula, the judge concluded:

But I have taken into account what the defendant's view of this was and I can see now, with the evidence that has been transmitted, how that view had been reflected in prior drafts and I have taken that also into account in determining what would be an appropriate sentence, because I do think that it is important that even though it was clear that I am not bound by all of this, that no defendant, particularly when he puts his life at risk in a situation such as this, should have an understanding with the government not carried forward.

The judge then sentenced Fields to four years imprisonment on count one and three years imprisonment on count two, but suspended the sentence on count two and replaced it with four years probation to run consecutively to the sentence on count one.

On appeal, Fields essentially renews the arguments he made at the sentencing hearing below concerning his interpretation of paragraph 11(5) of the plea agreement. He contends that both the government's refusal to adopt his interpretation in its sentencing recommendation, and the judge's failure to sentence him within the precise terms of his interpretation, violated the plea agreement. Fields therefore requests that we grant specific performance of the plea agreement, which he claims would entail crediting his thirty-one months of cooperation as time served against the four-year term that he actually received on count one. Alternatively, he asks us to vacate his sentence and remand for resentencing in accordance with the agreement.

## II.

This court in recent years has been repeatedly confronted with difficult questions concerning the interpretation and enforcement of plea agreements. The starting point in our resolution of these questions has consistently been the Supreme Court's seminal decision in *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). *See, e.g., United States v. Mercer*, 691 F.2d 343, 346 (7th Cir.1982); *United States v. Bowler*, 585 F.2d 851, 853 (7th Cir.1978). The Court in *Santobello* recognized that: "The disposition of criminal charges by agreement between the prosecutor and the accused ... is an essential component of the administration of justice. Properly administered, it is to be encouraged." 404 U.S. at 260, 92 S.Ct. at 498. The Court further explained, however, that the considerations in support of the practice of plea bargaining "presuppose fairness in securing agreement between an accused and a prosecutor." *Id.* at 261, 92 S.Ct. at 498. More specifically, the Court stated:

This phase of the process of criminal justice, and the adjudicative element inherent in accepting a plea of guilty, must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.

*Id.* at 262, 92 S.Ct. at 499. *See also Mabry v. Johnson*, — U.S. —, 104 S.Ct. 2543, 2547–48, 81 L.Ed.2d 437 (1984).

In *Santobello*, the prosecutor originally in charge of the defendant's case had expressly promised not to make a sentencing recommendation in exchange for the defendant's guilty plea in state court, and yet at the sentencing hearing a new prosecutor recommended that the defendant receive the maximum sentence. Notwithstanding the fact that the government's breach was "inadvertent," the Court concluded that "the interests of justice and appropriate recognition of the duties of the prosecution in relation to promises made in the negotiation of pleas of guilty will be best served by remanding the case to the state courts for further consideration" of whether peti-

tioner should be resentenced before a different judge or given the opportunity to withdraw his guilty pleas. 404 U.S. at 262–63, 92 S.Ct. at 498–99. Thus, *Santobello* dealt with a clear prosecutorial breach of an unambiguous promise in a plea agreement.

Although the Court's opinion in *Santobello* provides general principles to focus our analysis in any case involving a plea agreement, the case did not require the Court to decide the meaning of a facially ambiguous promise in such an agreement. In a long line of cases, however, this court has developed a consistent set of principles to govern our interpretation and enforcement of such ambiguous promises. One of the earliest and most important of these cases was *United States v. Bowler*, 585 F.2d 851 (7th Cir.1978). The disputed plea agreement provision at issue in *Bowler* stated that the government would recommend a maximum period of incarceration for the defendant of three years, but that the government's recommendation regarding incarceration "may be reduced" based on several mitigating factors, including the defendant's cooperation with the government in further prosecutions. *Id.* at 852–53. After pleading guilty pursuant to the agreement, the defendant appealed his sentences on the ground that the government had failed to fulfill its obligation under this provision to consider reducing its sentencing recommendation based on the specified factors. *Id.* at 853. The government responded by arguing that the language of this provision did not require it to reduce or even to consider reducing its sentencing recommendation in light of the enumerated factors, but rather "only created a unilateral option for the Government in its discretion to recommend or not recommend a lesser period of incarceration." *Id.*

This court rejected the government's construction of the sentencing provision, concluding that this provision embodied an implicit promise by the government "to undertake a good faith analysis" of the specified factors and to base its sentencing recommendation on such an analysis. *Id.* at 854. Under the government's interpreta-

tion, the court explained, the language providing that the government "may reduce" its recommendation based on the enumerated factors would be rendered meaningless, "for the Government had the authority to consider such mitigating factors even without the assent of the defendant to the language." *Id.* The court also eschewed the government's general strict construction approach to the language of the plea agreement:

> The language was included in the agreement as an indication to the defendant that these factors would in fact be considered in arriving at the recommendation as to sentence. The Government will not be allowed to avoid the obligation it thus incurred by claiming now that the language literally promises nothing to the defendant. A plea agreement is not an appropriate context for the Government to resort to a rigidly literal approach in the construction of language.

*Id.*

The court in *Bowler* further cited the "institutional framework within which plea bargaining takes place in our criminal justice system" as support for the conclusion that the plea agreement required the government to consider the specified mitigating factors in its sentencing recommendation. *Id.* While noting the Supreme Court's statements concerning the desirability of plea bargaining in *Santobello*, 404 U.S. at 261, 92 S.Ct. at 498, the court in *Bowler* added: "However, both to protect the plea bargaining defendant from overreaching by the prosecutor and to insure the integrity of the plea bargaining process, the 'most meticulous standards of both promise and performance must be met by prosecutors engaging in plea bargaining.'" *Bowler*, 585 F.2d at 854 (quoting *Correale v. United States*, 479 F.2d 944, 947 (1st Cir.1973)). Thus, after finding insufficient evidence in the record to indicate that the government considered all of the specified factors in its sentencing recommendation, the court in *Bowler* vacated the defendant's sentences and remanded for

specific performance of the government's promise to consider the factors and recommend a sentence accordingly, and for re-sentencing before the district judge. 585 F.2d at 855–56.

■ The cases since *Bowler* in which we have considered similarly vague provisions in plea agreements have been animated by two key principles. First, as we stated in *United States v. Mooney*, 654 F.2d 482 (7th Cir.1981), and have repeatedly reaffirmed: "A plea bargain is a contract, the terms of which necessarily must be interpreted in light of the parties' reasonable expectations. The resolution of each case depends upon the essence of the particular agreement and the Government's conduct relating to its obligations in that case." *Id.* at 486 (citation omitted). *See United States v. Strawser*, 739 F.2d 1226, 1230 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984); *Brooks v. United States*, 708 F.2d 1280, 1281 (7th Cir.1983); *United States v. Delegal*, 678 F.2d 47, 50 (7th Cir.1982). Based on this first principle, we have further observed that the interpretation of disputed terms in a plea agreement should be determined by the district court to which the plea was originally submitted based on "objective standards," and that where the district court has made such a determination, it should be set aside only if clearly erroneous. *See United States v. Strawser*, 739 F.2d at 1229–30.

■ Our adoption of an essentially contractual analysis of plea agreements, however, has been tempered by a second principle that recognizes the unique concerns created by ambiguous provisions in such agreements and the government's resultant duty to use special care in their drafting. We therefore warned in *United States v. Cook*, 668 F.2d 317 (7th Cir.1982), that: "The Government may not rely on favorable judicial construction to cure significant ambiguities in its plea agreements.

Plea agreements need to be carefully drawn and understood by all parties to avoid the problem illustrated by this case." *Id.* at 321 (citing *Bowler,* 585 F.2d at 851). *See also United States v. DeMichael,* 692 F.2d 1059, 1062–63 (7th Cir.1982) ("It is most distasteful to be confronted with conflicting testimony by lawyers with respect to the terms of an agreement which ought to be clear and indisputable in its terms."), *cert. denied,* 461 U.S. 907, 103 S.Ct. 1878; 76 L.Ed.2d 809 (1983). In sum, we have consistently adhered to the view expressed by the Third Circuit in *United States v. Crusco,* 536 F.2d 21, 26 (3d Cir.1976):

> The Government … must also clearly understand the scope and depth of its commitment and the need for precision in plea bargaining. It may reach port in the plea bargaining process but founder there because of careless or loose language in its commitment. Once it makes a promise, *Santobello* requires strict adherence.

### III.

■ With the foregoing principles in mind, we are confronted in this case with a plea agreement provision that is rife with serious ambiguities. Perhaps the most glaring ambiguity in paragraph 11(5) is in the phrase stating that the parties agree "that the sentencing court *might appropriately consider*" the period of Fields's cooperation as equivalent to incarceration for sentencing purposes. This phrase, much like the provision considered in *Bowler,* might be construed to create no obligation for the government even to consider the defendant's cooperation in its sentencing recommendation.[1] In fact, since the sentencing court always has the discretion to consider a defendant's cooperation, this provision might be interpreted as completely meaningless. Alternatively, the language could be thought to require the government not to oppose the court's con-

---

1. Although paragraph 17 does expressly require the government to notify the sentencing judge of the extent of Fields's cooperation, it does not cure the ambiguity in paragraph 11(5) as to whether the government *must* reduce *its* sentencing recommendation based on this cooperation.

sideration of Fields's cooperation as equivalent to incarceration, but not to obligate the government to recommend affirmatively that the court do so. Fortunately for both the parties and the court, this ambiguity did not become an issue in Fields's sentencing, and the government ultimately framed its sentencing recommendation as if paragraph 11(5) actually required it to factor Fields's cooperation into this recommendation.

As our prior discussion of this case painfully demonstrates, paragraph 11(5) is also ambiguous in the sense that it fails to indicate how Fields's sentence might be calculated so that his period of cooperation will be considered "equivalent to incarceration." Fields's method of calculating his sentence by using either parole dates or mandatory release dates as a base is not unreasonable, since if he had actually been in jail while he was cooperating with the government, his release date presumably would have been determined by reference to these dates. Fields's equation thus constitutes a plausible method of making his period of cooperation actually "equivalent to incarceration" for sentencing purposes. Contrary to Fields's contention on appeal, however, we also find that the government's method of simply subtracting the period of cooperation from the sentence that would otherwise be imposed is another reasonable interpretation of the plea agreement. Thus, considered in isolation, the plain language of paragraph 11(5) is insolubly ambiguous.

As we have repeatedly cautioned in the past, such ambiguity in plea agreements fails to serve the interests of either the defendant or the government. The danger that a criminal defendant will be misled into relinquishing important constitutional rights based on an inaccurate understanding of the plea agreement increases in direct proportion to the agreement's vagueness. Similarly, by giving rise to time-consuming disputes at trial or on appeal concerning the meaning of an agreement, such vagueness negates the advantages that the government can obtain through the plea bargaining process. While we recognize that the vagaries of the English language might sometimes obscure the parties' intent notwithstanding their care in negotiating and drafting a plea agreement, the kind of problems inherent in the language of paragraph 11(5) could have easily been avoided. There is no excuse for the use of language so vague as that which states that the sentencing court "might appropriately consider" a defendant's cooperation for sentencing purposes, and we hope that in the future the diligent efforts of both defense counsel and prosecutor can prevent the potential for unfairness and inefficiency that such language creates.

Despite the ambiguity in the language of the agreement, the record developed below allows us in this case to conclude that the defendant's reasonable expectations under the agreement were not violated by the government's method of considering Fields's cooperation in its sentencing recommendation.[2] The most convincing evi-

---

2. We note preliminarily the absence of support for Fields's argument on appeal that Judge Nordberg was bound by the agreement to consider Fields's period of cooperation as equivalent to incarceration for sentencing purposes. On this point, the agreement is not ambiguous, but rather states explicitly in paragraph 19 that the sentencing judge is not bound by the agreement and may impose the maximum penalties on each of the charges. Moreover, during the July 29 plea hearing, Judge Nordberg explained paragraph 19 to Fields and obtained his acknowledgement that he understood the paragraph and that he could be sentenced to the maximum penalties on his guilty pleas under the agreement. Fields's sole support for his contention that Judge Nordberg was bound by

the agreement is a reference to the judge's statement at the July 29 hearing that he would consider himself "bound" to some "limited extent" by the plea agreement. Considered in context, however, this rather general statement does not negate paragraph 19 of the agreement and Judge Nordberg's more specific statements at the July 29 hearing clearly to the effect that he would be free to impose the maximum sentences.

Our analysis is therefore directed exclusively to the question of whether the government breached its obligations under the plea agreement by failing to adopt Fields's method of factoring his period of cooperation into the government's sentencing recommendation.

dence in support of this conclusion is the testimony of Jerome Frese at the sentencing hearing. Frese not only testified that he personally understood paragraph 11(5) to mean that the period of Fields's cooperation would be simply subtracted from his initial sentence without regard to parole or mandatory release dates, but also testified that he informed Fields that this was the meaning of the agreement in response to Fields's questioning during plea discussions. Although Fields's attorneys argued to the district court and now to this court that they, along with Fields, always thought the agreement contemplated the use of parole and/or mandatory release dates in calculating Fields's sentence, Frese's testimony went uncontradicted by any sworn testimony.

Frese's unrebutted testimony concerning an earlier draft of the agreement requiring that the United States Parole Commission consider Fields's period of cooperation in calculating his probable release date also supports the government's rather than Fields's interpretation of the agreement. Granted, the terms of this earlier draft differ from Fields's interpretation of the ultimate agreement in that the draft requires the Parole Commission itself to consider his cooperation, while the agreement as interpreted by Fields requires the sentencing judge to do so with reference to Parole Commission guidelines. Notwithstanding this difference, the fact that the parties had previously considered a draft of the agreement that would have expressly involved the Parole Commission in determining Fields's sentence leads us to question whether they intended to require the use of Parole Commission guidelines or mandatory release dates when the final agreement contains no reference whatsoever to the Parole Commission or its guidelines.

Finally, the unexplained inconsistency between Fields's calculation of his sentence in his August 20 response to the government's presentence submission and his calculation at the sentencing hearing also casts doubt on his interpretation of the agreement. Indeed, the very difficulty of formulating a single coherent method of factoring parole and/or mandatory release dates into Fields's sentence militates against his contention that this was the parties' intention under the agreement. The explanation of paragraph 11(5) given by Judge Nordberg at the July 27 plea hearing, and agreed to by both counsel and Fields, refutes any contention that the judge would direct the Parole Commission or others to consider Fields's cooperation, but neither directly supports nor directly refutes Fields's interpretation of the agreement. Hence, the evidence in the record that we have found to constitute either support for the government's construction of the agreement or rebuttal of Fields's interpretation must lead us to conclude that the government's method of calculating Fields's sentence did not violate the agreement.

Furthermore, on the general question of whether the defendant in this case was treated fairly or received "what [was] reasonably due in the circumstances," *Santobello v. New York*, 404 U.S. at 262, 92 S.Ct. at 499, we note the judge's sensitive handling of Fields's understanding of the agreement at the sentencing hearing.[3] Although he was clearly not bound by the agreement, and he so stated at the outset, the judge expressly took Fields's interpretation of the agreement into account in his sentencing determination, and recognized the importance of the principle "that no defendant, particularly when he puts his life at risk in a situation such as this, should have an understanding with the

---

**3.** In so noting, however, we recognize that if we believed that the government's recommendation violated the plea agreement, we would be required to remand for resentencing regardless of whether it was clear that the sentencing judge was influenced by the improper recommendation. *See Santobello v. New York*, 404 U.S. at

262, 92 S.Ct. at 499 (where government violated agreement in its sentencing recommendation, remanding for further consideration by state courts despite the fact that sentencing judge "stated that the prosecutor's recommendation did not influence him and we have no reason to doubt that").

government not carried forward." Moreover, the sentence of four years incarceration that Fields ultimately received was less than the four years and six months maximum sentence that he had calculated in his August 20 response.

For these reasons, the defendant's sentences are AFFIRMED.