THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. GUS DASAKY, Defendant-Appellee.

First District (2nd Division)    No. 1—97—2027

Opinion filed March 23, 1999.—Rehearing denied April 20, 1999.

McNULTY, J., dissenting.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Rachel Davis, Assistant State's Attorneys, of counsel), for the People.

John J. Armellino, Jr., and Dean C. Morask, both of Chicago, for appellee.

JUSTICE COUSINS delivered the opinion of the court:

On February 4, 1994, defendant, Gus Dasaky, was arrested and indicted under No. 94—CR—6193 for the offenses of armed violence and possession of a controlled substance with intent to deliver. On April 25, 1994, defendant signed a debriefing and consideration agreement with the Cook County State's Attorney's office (CCSAO) in order to minimize his sentence. When defendant entered into the debriefing and consideration agreement on April 25, 1994, he had two pending cases. The first case, No. 93—C6—60848, stemmed from a 1993 arrest for a Class X offense and the second was the 1994 indictment, No. 94—CR—6193. Before the debriefing meeting, the assistant State's Attorney wrote a letter to the defendant's attorney advising that the possibility of the defendant's cooperation would not be pursued if the defendant picked up another case. On May 24, 1994, defendant was arrested and indicted under No. 94—CR—21344 for the offense of possession of a controlled substance with intent to deliver. As a result of the May 1994 arrest, the CCSAO voided the debriefing and consideration agreement between itself and defendant. On May 18, 1995, defendant entered into an agreement to interview with the Illinois Attorney General's office (IAGO) and subsequently testified before a statewide grand jury in regard to a different case. On March 13, 1997, the trial court entered an order granting defendant's pretrial motion to dismiss pending indictments or, in the alternative, enforce the agreement between defendant and the IAGO by executing a disposition of probation or boot camp in the instant cases. On April 23, 1997, the CCSAO refused to comply with the agreement between defendant and the IAGO, and the trial court accordingly dismissed indictments Nos. 94—CR—6193 and 94—CR—21344 against defendant. On appeal, the State contends that the trial court erred in finding that the alleged sentencing agreement of probation between the IAGO and defendant was binding upon the CCSAO thus requiring the CCSAO to enforce a disposition of either probation or boot camp in defendant's pending cases.

BACKGROUND

On February 4, 1994, defendant was arrested pursuant to a search warrant and indicted under No. 94—CR—6193 by the grand jury in

the circuit court of Cook County for armed violence and possession of a controlled substance with intent to deliver.

On March 1, 1994, defendant's attorney, Marc Barnett, wrote a letter to Assistant State's Attorney (ASA) Dave O'Conner stating that defendant was interested in setting up an appointment for the purpose of cooperating. In the letter, Barnett requested that ASA Sandra Brode be assigned the case as she was the ASA appointed to a case defendant had then pending before a different judge. Thereafter, on March 8, 1994, ASA Brode wrote a letter to Barnett explaining that she could not set up a debriefing meeting until defendant's new case had been assigned to a judge. However, if defendant picked up another charge of any kind between then and the debriefing, she would not pursue the possibility of defendant's cooperation with the CCSAO.

On April 25, 1994, defendant entered into a debriefing and consideration agreement with the CCSAO. At the time defendant entered into the agreement, he had two pending narcotics cases.. The first charge stemmed from defendant's arrest on July 15, 1993, indictment number 93—C6—60848, which is a Class X offense with a minimum sentence of six years in the Illinois Department of Corrections (IDOC). The second charge was a super Class X offense stemming from defendant's arrest on February 4, 1994, indictment number 94—CR—6193, with a minimum sentence of nine years in the IDOC. The April 1994 agreement provided that the consideration defendant would receive was a reduction of charge and/or recommendation of sentence by the CCSAO. The agreement further provided that if defendant was arrested for any crime subsequent to the date of the agreement, it would be null and void.

On May 24, 1994, defendant was arrested by the Metropolitan Enforcement Group (MEG) and indicted under No. 94—CR—21344 for the offense of possession of a controlled substance with intent to deliver, a Class X offense with a minimum sentence of six years in the IDOC. As a result, ASA Brode wrote a letter to Barnett indicating that defendant's arrest on May 24, 1994, "voids any and all agreements that were signed with our office relative to cooperation." The letter further indicated that Special Agent Gary Reichenberger of the MEG was informed that defendant was not to be permitted to work as an informant and that he was to receive no consideration regarding the setting of bond in his pending cases.

In early May 1995, subsequent to defendant's third arrest, Agent Reichenberger, who knew defendant from his two prior arrests, contacted Barnett to set up a meeting with defendant. The meeting resulted in a three-page debriefing report detailing defendant's involvement in criminal activities with MEG "target" Glen Svagdis. A

copy of this report was given to Assistant Attorney General (AAG) Clyde Lemons, who was assigned to the IAGO's statewide grand jury bureau.

On May 18, 1995, AAG Lemons met with defendant on behalf of the IAGO and executed the following agreement to interview:

"The [IAGO] agrees to participate in an interview with [defendant] on May 18, 1995. It is also agreed that the [IAGO] will not use any statement made by [defendant], during this interview against him in a criminal prosecution. The statement made by [defendant] during this interview must be completely truthful.

This agreement shall not be construed as statutory immunity pursuant to 725 ILCS 5/106 [sic], in that the [IAGO] may pursue and investigate any and all leads derived in any way from the statements of [defendant] which would result in the acquisition of evidence admissible in a prosecution against him. This agreement, also, shall not be construed to bar the use of statements by [defendant], during the interview as impeachment in the event that he testifies in a manner inconsistent with his statements in any subsequent proceeding.

This agreement shall not be construed as an offer to amend or nolle pros [sic] any past, pending or future charges or construed as a promise to make such an offer in the future."

On May 19, 1995, defendant appeared before a statewide grand jury and was admonished regarding the contents of the agreement to interview entered into between him and the IAGO. Thereafter, he testified consistently with the debriefing report generated by Agent Reichenberger.

Lisa Megan and defendant's brother, John Dasaky, also had Class X charges pending against them and testified regarding the same MEG target. Lisa and John signed similar agreements to interview with the IAGO. Defendant, Lisa, and John were all represented by Barnett at the time the agreements with the IAGO were made and when they appeared before the grand jury. Subsequent to their appearance before the grand jury, Lisa and John pled guilty to their offenses and each was sentenced to a term of probation.

On September 14, 1995, attorney John Armellino filed an appearance on behalf of defendant. Thereafter, on April 22, 1996, defendant filed a pretrial motion to dismiss pending indictments or enforce the agreement.

The hearing on defendant's motion was held on August 5, 1996. Defendant testified that, prior to his May 12, 1995, meeting with Agent Reichenberger, his understanding was that if the information he provided to the MEG was helpful, he would get probation or boot camp. However, he acknowledged that nowhere in the May 1995 agree-

ment was it stated that defendant would get probation or boot camp in exchange for his cooperation.

AAG Lemons testified that he informed defendant that anything defendant said in the interview with the IAGO could not be used against him at a trial unless defendant perjured himself while under oath. He also informed defendant that, despite defendant's cooperation, the IAGO could make no promises regarding any pending cases other than informing the CCSAO that defendant had cooperated. Moreover, neither he nor anyone in his presence ever promised defendant probation or boot camp in return for his grand jury testimony.

The case was continued to September 5, 1996, wherein Agent Reichenberger testified that the May 12, 1995, meeting was set up to "merely allow [defendant] the opportunity to begin cooperating again." He further stated that neither he nor anyone else in his presence made defendant any promises of probation or boot camp in exchange for the information provided.

Barnett testified that there was no *quid pro quo* for the April 1994 agreement and that defendant was not promised anything for his cooperation in May 1995. Rather, it was explained that defendant's testimony would be a voluntary contribution, which meant that the IAGO was not bound to do anything in return. Barnett further indicated that he did not tell defendant that he would get probation or boot camp as a result of his cooperation under either the April 1994 or May 1995 agreement. Rather, he allowed defendant to perform under the May 1995 agreement so that Barnett would have a basis for an argument in mitigation at the sentencing hearings in defendant's cases.

On January 29, 1997, defendant was granted leave to reopen the hearing for the limited purpose of adducing evidence in support of his allegation that Barnett's testimony was designed to shield himself inasmuch as Barnett was guilty of extorting money from defendant's parents. Accordingly, on February 13, 1997, defendant presented further testimony regarding Barnett's credibility.

Defendant, John, and Joanne Dasaky, defendant's mother, testified that Barnett requested $7,500 from defendant's parents as a "pay off" to be paid "to the attorney general, the state's attorney, or the police" in order to induce them to allow defendant and John the opportunity to testify before the grand jury. Defendant's parents ultimately paid Barnett $3,500 on behalf of John; however, no monies were paid on behalf of defendant. Defendant further testified that he declined to pay Barnett the $3,500 because he did not trust him. Rather, defendant "wasn't going to pay [Barnett] until after [he] saw results."

On February 28, 1997, following the State's final argument, the

court took the matter under advisement to write an opinion. Thereafter, on March 13, 1997, the trial court found:

"In reliance upon the government's promises, express or implied, and at the government's behest, the defendant relinquished his right against self-incrimination; that defendant's rights cannot be restored, and he is entitled to have his reasonable expectations enforced.

Wherefore, upon the failure and refusal of the State to perform its obligations under the agreement within a reasonable time, the defendant may apply to the court for entry of orders consistent with this opinion."

The case was continued for a status hearing on April 23, 1997, wherein the following colloquy occurred:

"MS. O'CONNER: Judge, we are ready to set this case for trial. We are not in a position to enforce any type of probation or Boot Camp offer here or to make an offer. I think that was what the ruling was about. We're not going to do that.

THE COURT: Does the State thoroughly understand the nature of the order that I entered? From what I'm hearing you say, I have a question as to whether or not my ruling was understood?

MS. O'CONNER: The ruling as I understood it, Judge, was you would either enforce some type of probation or Boot Camp disposition, but it's not specified, and if not that then you would dismiss the case.

THE COURT: You understand it precisely."

The defendant then made a motion to dismiss the charges against him. The court granted the motion and accordingly dismissed indictments Nos. 94—CR—6193 and 94—CR—21344 against defendant. The State appeals.

We reverse and remand.

OPINION

The thrust of the State's argument on appeal is that the trial court erred in finding that the alleged sentencing agreement of probation between the IAGO and defendant was binding upon the CCSAO, thus requiring the CCSAO to enforce a disposition of either probation or boot camp in defendant's pending cases. Within this contention, the State urges this court to find that the CCSAO is not bound by agreements entered into by the IAGO.

■ Under the Illinois Constitution, the Attorney General is the chief legal officer of the State and has "the duties and powers that may be prescribed by law." Ill. Const. 1970, art. V, § 15; *People v. Massarella*, 72 Ill. 2d 531, 534, 382 N.E.2d 262, 264 (1978). The power of the Attorney General may be exercised concurrently with or indepen-

dently of the power of the State's Attorney to initiate and prosecute all actions, suits, indictments and prosecutions in his county as conferred by statute. See 15 ILCS 205/4 (West 1996); 55 ILCS 5/3—9005(a) (West 1996). The Attorney General lacks the power to take exclusive charge of the prosecution of those cases over which the State's Attorney shares authority. *People v. Buffalo Confectionery Co.*, 78 Ill. 2d 447, 455, 401 N.E.2d 546, 549 (1980). However, the Attorney General is authorized to "consult with and advise the several state's attorneys; and *** attend the trial of any party accused of a crime, and assist in the prosecution." 15 ILCS 205/4 (West 1996). As such, we agree with the trial court that had any agreements been entered into between defendant and the IAGO of which the CCSAO was aware, they should have been honored by the CCSAO. However, for the reasons set forth below, we do not agree that there exists such an agreement thereby binding the CCSAO.

■ It is undisputed that the debriefing and consideration agreement entered into between defendant and the CCSAO in April 1994 was rendered null and void upon defendant's third arrest on May 24, 1994. Rather, the agreement upon which defendant relies is the agreement to interview entered into between him and the IAGO on May 18, 1995. Federal circuit courts have analogized such cooperation agreements to plea agreements containing cooperation clauses. See *United States v. Knights*, 968 F.2d 1483 (2d Cir. 1992); *United States v. Doe*, 940 F.2d 199 (7th Cir. 1991); *United States v. Carrillo*, 709 F.2d 35 (9th Cir. 1983). In Illinois, a sentencing or plea agreement results when the prosecutor and the defendant exchange promises to perform or refrain from performing specified actions. *People v. Navarroli*, 121 Ill. 2d 516, 521, 521 N.E.2d 891, 893 (1988). Its terms and conditions are questions of fact that the trier of fact must determine after assessing the credibility of witnesses and the weight to be given their testimony. *People v. Starks*, 146 Ill. App. 3d 843, 846, 497 N.E.2d 187, 189 (1986). If disputed, the terms of the agreement are to be judged under objective standards. *People v. Schmitt*, 173 Ill. App. 3d 66, 106, 527 N.E.2d 384, 408 (1988). The court's determination whether there was an agreement should not be reversed unless contrary to the manifest weight of the evidence. *Navarroli*, 121 Ill. 2d at 522, 521 N.E.2d at 893.

■ Supporting affirmance of the trial court decision, the dissent in this appeal cites *People v. Weilmuenster*, 283 Ill. App. 3d 613, 670 N.E.2d 802 (1996). We embrace the doctrine quoted in *Weilmuenster* that the "trial court has the inherent authority to dismiss a criminal indictment where the defendant has been denied due process or there would be a miscarriage of justice." *Weilmuenster*, 283 Ill. App. 3d at

624, 670 N.E.2d at 809. However, we do not agree with the dissent's view that a predicate exists for invoking that doctrine in the case *sub judice*. *Weilmuenster* is inapposite.

In *Weilmuenster*, no issue existed that "transactional" immunity would preclude further prosecution. Also, no issue existed that the defendant was offered immunity for his grand jury testimony. The issue in *Weilmuenster* was whether the defendant was entitled to "use" immunity or "transactional" immunity.

The facts in that case were that the defendant, who had an eighth-grade education, did not have an attorney. He testified that he was told that he did not need an attorney. It was his understanding that the immunity granted to him precluded prosecution. After hearing evidence, the trial court concluded that the defendant did not comprehend the difference between "transactional" immunity and "use" immunity. Moreover, among other facts and circumstances considered by the trial court, there was an immunity agreement that bore a date one year after the testimony. Other testimony considered by the trial court included testimony of an agent of the Illinois State Police who visited defendant in prison, interviewed him and met with defendant just prior to defendant's testimony before the grand jury. This agent testified that it was his understanding the defendant would not be prosecuted if he testified before the grand jury. After an evidentiary hearing regarding the nature and scope of the immunity promised and given to the defendant, the court in Kane County granted defendant's motion and discharged him. In *Weilmuenster*, on appeal, the trial court's decision was affirmed. *Weilmuenster*, 283 Ill. App. 3d at 626, 670 N.E.2d at 810. In *Weilmuenster*, the decision of the trial court to dismiss was not against the manifest weight of the evidence.

█ In contradistinction to *Weilmuenster* and in our view, the decision of the trial court in the case *sub judice* was against the manifest weight of the evidence, and we so hold. Here, defendant contends that the May 1995 agreement gave him the benefit of a disposition of probation or boot camp in his instant cases, relying solely on defendant's testimony that it was his "understanding" that he would receive such if the information he provided was helpful to the IAGO. However, in our view, the evidence demonstrated that the cooperation agreement entered into between defendant and the IAGO did not include any preplea-bargained-for consideration to execute a disposition of probation or boot camp in defendant's pending cases. Rather, the clear and unambiguous language of the agreement stated that it was "not to be construed as an offer to amend or nolle pros [*sic*] any past, pending or future charges or construed as a promise to make such an offer in the future." Although defendant asserts that Agent Reichenberger and his

former attorney, Barnett, told him that he would receive such a disposition, both parties testified that neither they nor anyone else in their presence ever promised defendant probation or boot camp in return for his grand jury testimony.

The dissent in this appeal also writes that the trial court "did not find the testimony of [Agent] Reichenberger and Barnett, [defendant's former attorney] that defendant was just volunteering his cooperation in exchange for nothing, to be credible." 303 Ill. App. 3d at 997. Even so, in our view, the record in this case established that there was no agreement with defendant binding the CCSAO after defendant's third arrest.

Defendant further contends that since Lisa Megan and John Dasaky entered into the same agreement to interview and received probation sentences subsequent to their grand jury testimony, one could objectively infer that an agreement existed between the defendant and the State. However, we are unpersuaded that the probation sentences of Lisa and John, who both had only one pending charge against them, imply that an agreement existed between defendant and the State that would obligate the State to recommend probation or boot camp as dispositions, particularly where defendant had three pending Class X charges against him totalling a minimum of 21 years' incarceration if he were found guilty.

Moreover, even assuming *arguendo* the existence of a plea agreement, in the absence of a separate agreement to dismiss, the trial court still erred by dismissing the charges in the case *sub judice*. Plea agreements are only enforceable where a defendant enters a guilty plea in reliance on a promise of a prosecutor, which thereby results in prejudice. *Santobello v. New York*, 404 U.S. 257, 263, 30 L. Ed. 2d 427, 433, 92 S. Ct. 495, 499 (1971); *Mabry v. Johnson*, 467 U.S. 504, 510, 81 L. Ed. 2d 437, 444, 104 S. Ct. 2543, 2548 (1984). As such, defendant is not prejudiced until he pleads guilty or surrenders a constitutionally protected interest in reliance on the promise which the State actually revokes. *Navarroli*, 121 Ill. 2d at 522-23, 521 N.E.2d at 893; *People v. Boyt*, 109 Ill. 2d 403, 415, 488 N.E.2d 264, 270 (1986). Here, defendant has not entered a plea of guilty in reliance on the purported agreement; therefore, he cannot say he was deprived of liberty by virtue of the State's refusal to execute a disposition of probation or boot camp as he still has the option of pleading not guilty and proceeding to trial on both indictments. However, entering a plea of guilty is not the only prejudice recognized as a surrendering of a constitutional right. *People v. Raymond*, 202 Ill. App. 3d 704, 707, 560 N.E.2d 26, 28 (1990). If defendant surrendered a constitutionally protected interest in detrimental reliance on the promise, he may be found to have been prejudiced. *Cf. People v. Schmitt*, 173 Ill. App. 3d 66, 527 N.E.2d 384 (1988).

The trial court found that defendant surrendered his constitutional rights in reliance on the agreement by relinquishing his fifth amendment privilege against self-incrimination in his interview with Agent Reichenberger and subsequent grand jury testimony. As such, defendant contends that he is entitled to specific performance of his agreement. However, the privilege against self-incrimination protects one from being *compelled* to disclose facts tending to establish criminal liability. *Navarroli*, 121 Ill. 2d at 525, 521 N.E.2d at 895. Defendant does not claim that he engaged in any criminal activities in reliance on the proposed bargain, nor does he state that the MEG compelled him to disclose information that might incriminate him. The record indicates only that the defendant *voluntarily* provided information to Agent Reichenberger, and subsequently AAG Lemons. *Defendant may have had hopes for leniency. However, he had neither an offer nor an agreement.* Although Barnett's credibility was called into question regarding purported extortion claims, the manifest weight of the evidence does not support defendant's assertions that he was to receive probation or boot camp in exchange for his grand jury testimony.

Moreover, the State lacked the authority to perform under the purported terms of the agreement as it has no independent control over sentencing. See *People v. Provenzano*, 265 Ill. App. 3d 33, 39, 637 N.E.2d 783, 788 (1994). Implicit in every plea agreement is its acceptance by the trial court. *United States v. McGovern*, 822 F.2d 739, 743 (8th Cir. 1987). As such, a defendant is not justified in relying substantially on the terms of the agreement until the trial judge approves and accepts the guilty plea. *McGovern*, 822 F.2d at 746; *Navarroli*, 121 Ill. 2d at 529, 521 N.E.2d at 896. Our supreme court noted:

> " 'The only change in position that can be considered "detrimental reliance" is the actual entry of an involuntary guilty plea. Not until that point has the defendant been deprived of any constitutionally protected liberty interest. [Citation.] When, as in this case, the defendant learns of a change in the terms of a plea agreement prior to entering his plea, a detrimental reliance argument is inappropriate. At that stage, defendant still has the option of pleading not guilty and proceeding to trial.' " *Navarroli*, 121 Ill. 2d at 528, 521 N.E.2d at 896, quoting *United States v. Coon*, 805 F.2d 822, 825 (8th Cir. 1986).

The seventh circuit has even commented that "either party should be entitled to modify its position and even withdraw its consent to the bargain until the plea is tendered and the bargain as it then exists is accepted by the court." *United States v. Ocanas*, 628 F.2d 353, 358 (5th Cir. 1980). "This fundamental right would be belittled if we held it to be an insufficient 'remedy' or result for a defendant who has not

been induced to rely on the plea to his detriment." *Government of Virgin Islands v. Scotland*, 614 F.2d 360, 365 (3d Cir. 1980).

Accordingly, it is our view that the circuit court erred in dismissing indictments Nos. 94—CR—6193 and 94—CR—21344 against defendant. For the reasons given, the judgment of the circuit court is reversed and the cause is remanded for further proceedings.

Reversed and remanded.

RAKOWSKI, J., concurs.

JUSTICE McNULTY, dissenting:

The majority, in reversing and remanding this case, has disregarded factual findings made by the trial court. It reversed the trial court for enforcing a vague agreement, although the trial court expressly refused to enforce the agreement. It has also ignored state and federal case law defining obligations of governmental law enforcement agencies to deal fairly and in good faith in soliciting the cooperation of persons charged with criminal offenses to relinquish their privilege against self-incrimination.

Persons who enter into cooperation agreements with the government in criminal cases do so because they are in serious legal difficulties and are seeking to avoid or ameliorate their problems by furnishing information in pending investigations. The bargaining positions are not equal. The government has the upper hand. For this reason, extensive state and federal legal authority requires that governmental agencies deal fairly with a defendant in offers of immunity or sentencing consideration to obtain a waiver of constitutional rights in exchange for information exposing him to additional criminal liability. *United States v. Knights*, 968 F.2d 1483 (2d Cir. 1992); *United States v. Rexach*, 896 F.2d 710 (2d Cir. 1990); *People v. Raymond*, 202 Ill. App. 3d 704, 560 N.E.2d 26 (1990). The terms of the bargain must be spelled out in terms explicit enough for an independent trier of fact to determine that the defendant was fully and fairly informed of what he was to receive in exchange for the relinquishment of his rights. If this does not occur, contrary to the majority conclusion, the relinquishment is not voluntary in the constitutional sense. *Raymond*, 202 Ill. App. 3d at 708-09.

Under the majority's analysis, if the government couches a cooperation agreement in vague and uncertain terms, it may induce a defendant charged with serious criminal offenses to waive his privilege against self-incrimination, testify before an investigative body, implicate himself in further criminal activity, and incur, in return, no

obligation whatever to give any consideration therefor in its sole and unfettered discretion. In other words, vagueness in defining the government's obligations to a defendant in an agreement written by the government inures to its benefit, to the detriment of the defendant. There is much legal authority to the contrary. *People v. Weilmuenster*, 283 Ill. App. 3d 613, 670 N.E.2d 802 (1996); *People v. Schmitt*, 173 Ill. App. 3d 66, 527 N.E.2d 382 (1988), *rev'd on other grounds*, 131 Ill. 2d 128, 545 N.E.2d 665 (1989); *United States v. Fields*, 766 F.2d 1161 (7th Cir. 1985).

Defendant brought a motion before the court to compel specific performance of a cooperation agreement between the IAGO and defendant. The trial court determined the constitutional issue at hand to be whether the State engaged in a course of conduct in soliciting defendant's cooperation and relinquishment of his privilege against self-incrimination that gave him a reasonable expectation of receiving some consideration from the CCSAO on the disposition of his pending criminal charges.

That is an issue of fact. The trial court held an evidentiary hearing and heard testimony from many witnesses. The testimony of defendant's witnesses contradicted that of Agent Reichenberger, AAG Lemons and defendant's former attorney, Barnett. The court made explicit findings of fact and gave reasons why it did not find the testimony of Reichenberger and Barnett, that defendant was just volunteering his cooperation in exchange for nothing, to be credible.

The majority states that defendant surrendered his constitutional rights against self-incrimination in his interview with Reichenberger and before the statewide grand jury voluntarily so that his attorney would have a basis for argument in mitigation at the sentencing proceedings on defendant's pending cases. The majority bases its conclusion on the testimony of attorney Barnett and Agent Reichenberger. The trial court heard Barnett's testimony that no promises were made by either agency in exchange for his cooperation and evaluated it as follows:

> "It strains credulity to accept the proposition that defendant voluntarily and knowingly placed himself in the position [of effectively surrendering his defense in this case] based on public spirited notions, without any expectations of benefit to himself. He was clearly attempting to minimize his predicament."

The trial court questioned Barnett with respect to his testimony that defendant was not promised anything in return for his cooperation. The trial court asked Barnett if defendant "was to waive his fifth amendment rights and undertake whatever risks are involved in his cooperating with the State, and it is left entirely in the discretion of

the State's Attorneys and/or the Attorney General to decide what, if anything, they do?" Barnett responded that this was correct. The trial court found that Barnett's testimony defied common sense and that Barnett's testimony was motivated by Barnett's own interests.

Agent Reichenberger testified that no promises of boot camp or probation were made to the defendant but defendant's cooperation would be made known to the CCSAO for its consideration. The majority cites this testimony in support of its conclusion that defendant was offered nothing in exchange for his testimony. The trial court, however, in evaluating this testimony, said in its dispositional order:

"While that may be true [that no specific promises were made], it seems incredible that no discussion whatsoever was had as to what the defendant could expect for his cooperation. *** The state virtually concedes that it was required to consider defendant's performance, and if satisfied, determine what consideration would be forthcoming."

Again, there is nothing in the record to support the majority's bestowing more credibility on this witness than did the trier of fact after an evidentiary hearing.

The case of *People v. Weilmuenster*, 283 Ill. App. 3d 613, 670 N.E.2d 802 (1996), is directly on point. There was a written judicial order stating that Weilmuenster had been given only "use" immunity in exchange for his cooperation, and the trial judge had admonished him as to the scope of this grant. The trial judge also stated in the order that he believed *Weilmuenster* understood the admonition. Over objection by the IAGO, and the judicial order notwithstanding, the trial court reopened the proofs to determine, as defendant alleged, whether the government had engaged in a course of conduct after the entry of the judicial order that gave defendant a reasonable expectation that he would be given broader "transactional" immunity foreclosing prosecution on the pending charges. The testimony of the government and defense witnesses conflicted, as it did in the case at bar. The trial court in *Weilmuenster* resolved the matter of witness credibility in favor of the defense, as did the judge in the case at bar.

A unanimous panel of this court, second district, affirmed dismissal of the indictment by the trial court to prevent a miscarriage of justice after a determination that it could not grant specific performance of the immunity agreement. If the legal analysis of the majority in the case at bar is applied to the facts in *Weilmuenster*, defendant loses, because the only writing defining the scope of the immunity conferred was the judicial order granting "use" immunity that did not bar prosecution on his pending drug charges in that case. The only reason for the difference in result between *Weilmuenster* and the case

at bar is that the reviewing court in *Weilmuenster* gave proper deference to the factual determinations of the trial court, and the majority of this court in the case at bar does not.

As the trial judge in the case at bar correctly found, there was a concerted effort by defendant's lawyer and the governmental agencies involved to shroud the consideration defendant was to receive in ambiguity and obscurity. If the defendant's attorney and the governmental agencies involved had made a reasonable effort to set forth the exact nature of their understanding, this entire controversy could have been avoided. They chose not to do so. The Attorney General wrote the agreement and ambiguities are resolved in favor of the defendant. *Weilmuenster*, 283 Ill. App. 3d at 625.

Relying on *People v. Navarroli*, 121 Ill. 2d 516, 521 N.E.2d 891 (1988), the majority says that, in the absence of an agreement to dismiss, the court erred in dismissing the charges because plea agreements are only enforceable when a defendant enters a guilty plea in reliance on a prosecutor's promise. This principle does not apply to the case at bar because the written agreements in question were not plea agreements, but were specifically described therein as cooperation agreements. In a plea agreement, a defendant gives up his constitutional right to trial in exchange for consideration. Nothing has been relinquished until defendant pleads guilty. In a cooperation agreement, the defendant relinquishes his fifth amendment privilege against self-incrimination and implicates himself and others in criminal conduct. *People v. Raymond*, 202 Ill. App. 3d 704, 560 N.E.2d 26 (1990). Defendant in the case at bar did precisely that before the statewide grand jury. The trial court explicitly found that the defendant by so doing had placed himself in a position where it would be impossible for him to make a defense in these cases or minimize the seriousness of the offenses.

Finally, the trial court did not order specific performance of any agreement expressed or implied. It dismissed the indictment under the inherent authority of the court to avert a miscarriage of justice. This remedy was granted by the trial court in *Weilmuenster* under circumstances strikingly similar to those involved in the case at bar. The propriety of granting that remedy was upheld by a unanimous panel of this appellate court.

The trial court dismissed the indictment because the record showed that defendant cooperated fully with the government in response to its solicitation, testifying fully and truthfully before a grand jury. The CCSAO was aware of the IAGO investigation and did not object to the activities of the IAGO in convening the grand jury. Indictments returned therefrom would be prosecuted by the CCSAO. The

IAGO was acting within its authority, and the CCSAO is bound by the IAGO agreement with defendant. *People v. Buffalo Confectionery Co.,* 78 Ill. 2d 447, 401 N.E.2d 546 (1980); *People v. Massarella,* 72 Ill. 2d 531, 382 N.E.2d 262 (1978). Agent Reichenberger knew of defendant's three pending felony charges when he solicited defendant's cooperation with the IAGO. He also knew the agreement with the CCSAO had been revoked and had consulted with the ASA who wrote that agreement. Defendant, the trial court found, under these circumstances had a reasonable expectation that he would receive some consideration in exchange for his truthful testimony before the grand jury, as had John Dasaky and Lisa Megan. John Dasaky and Lisa Megan had to testify for the IAGO before the statewide grand jury in order to receive their pre-plea "consideration" from the CCSAO. Their cooperation agreements with the CCSAO also were not specific about what consideration they would receive. The trial court was not able to determine what consideration was offered to defendant because the IAGO agreement was vague and unclear. After the defendant gave his full cooperation and truthful testimony before the statewide grand jury, the CCSAO took the position that it had no obligation to give defendant any consideration, and it offered none. Under the facts of this case as determined by the trial court, the CCSAO's repudiation of any obligation to give consideration to defendant constituted bad-faith conduct and an embarrassment to the ethics of the commercial market place in addition to those of the criminal justice system. The trial court in the case at bar, as in *Weilmuenster,* found that under the facts presented, specific performance could not be granted. It then exercised the only remedy available that protects the integrity of the judicial process and the due process rights of the defendant by dismissing two of the indictments against defendant.

The memorandum and opinion of the trial court details its factual findings and reasons therefor. It also cites extensive state and federal authority supporting its conclusions of law and relief granted based thereon. It is appended as an unpublished addendum hereto.

For the foregoing reasons, I dissent.